DuaneMorris®

FIRM and AFFILIATE OFFICES

NEW YORK
LONDON
SINGAPORE
LOS ANGELES
CHICAGO
HOUSTON
HANOI
PHILADELPHIA
SAN DIEGO
SAN FRANCISCO
BALTIMORE
BOSTON
WASHINGTON, DC
LAS VEGAS
ATLANTA
MIAMI
PITTSBURGH
NEWARK
BOCA RATON
WILMINGTON
CHERRY HILL
PRINCETON
LAKE TAHOE
HO CHI MINH CITY

ANDREW T. HAHN, SR.
DIRECT DIAL: 212-692-1066
PERSONAL FAX: +1 212 208 2521
*E-MAIL*: athahn@duanemorris.com

*www.duanemorris.com*

**VIA ECF**

January 17, 2012

The Honorable Nina Gershon, U.S.D.J.
United States District Court
  for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:  **Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.,**
>         **Docket No. 06-CV-1842 (NG)(JO) (E.D.N.Y.)**

Dear Judge Gershon:

On behalf of Defendant Allstate Insurance Company ("Allstate"), we respond to the letter of Plaintiff's counsel, John Spadaro, Esq., dated January 13, 2012. Since Mr. Spadaro feels free to submit update letters to Your Honor, Allstate would like to take this opportunity as well to update Your Honor on certain developments in the case law that are relevant to Allstate's motion to dismiss. Oral argument for said motion is currently scheduled for January 24, 2012 at 2:30 pm.

As an initial matter, Mr. Spadaro's reliance on *Stammco, LLC v. United Tel. Co. of Ohio*, No. F-11-003, 2011 WL 6352306 (Ohio Ct. App. Dec. 16, 2011), is misplaced, especially after the U.S. Supreme Court's decision in *Shady Grove I. See In re Katrina Canal Breaches Litig.*, 401 Fed. Appx. 884, No. 09-31071, 2010 WL 4561378, at *2 (5th Cir. Nov. 11 2010) (citing the U.S. Supreme Court's decision in *Shady Grove I*, the Fifth Circuit held, "Because Rule 23 governs the instant actions, and we conclude that the district court correctly applied the rule [to deny class certification], reliance on state court decisions in support of certification is unavailing."). A copy of this decision is attached as **Exhibit A** hereto.

Equally significant, in its opposition to the motion to dismiss, Shady Grove relies heavily on *Bulmash v. Travelers Indemnity Co.*, 257 F.R.D. 84 (D. Md. 2009), which granted class certification for failure to tender penalty interest under Maryland's no-fault law. *See* Md. Code Insurance § 19-508(c). To the extent the federal court in *Bulmash* relied on state court decisions,[1] that court's

---

[1]     *See Bulmash*, 257 F.R.D. at 91 ("In several state court cases confronting nearly identical proposed classes, class certification has been found appropriate.").

DuaneMorris

The Honorable Nina Gershon, U.S.D.J.
January 17, 2012
Page 2

decision should not be considered persuasive in view of the Fifth Circuit's holding in *Katrina.*

On November 28, 2011, the U.S. Supreme Court heard arguments in *First American Financial Corp. v. Edwards,* No. 10-708, in which the question presented is whether Edwards, a purchaser of real estate settlement services, has standing under Article III, Section 2 of the U.S. Constitution. Edwards contended that she was entitled to statutory damages pursuant to the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2607(a). Edwards had alleged no actual harm, but nevertheless commenced a class action to recover statutory penalty allowed under RESPA. Here, Shady Grove also seeks to recover a statutory penalty in the absence of any actual economic damage. Accordingly, Shady Grove has not suffered any injury in fact to establish standing under Article III of the U.S. Constitution. For this Court's reference, a copy of the oral argument in *First American Financial* is attached as **Exhibit B** hereto.[2]

As set forth in Allstate's motion to dismiss and motion to strike the class allegations, Shady Grove's putative class is unascertainable because it constitutes an improper "fail safe" class. Allstate will not repeat those arguments here, but simply notes for this Court's reference subsequent cases denying class certification based on a "fail safe" class. *See, e.g., Schilling v. Kenton County, KY*, Civ. Action No. 10-143-DLB, 2011 WL 293759 (E.D. Ky. Jan. 27, 2011); *Jones-Turner v. Yellow Enterprise Systems, LLC*, Civ. Action No. 3:07CV-218-S, 2011 WL 4861882 (W.D. Ky. Oct. 13, 2011). A copy of those decisions is attached as **Exhibit C** hereto. Indeed, in order to respond to certain discovery requests propounded by Shady Grove, Allstate has had to engage in a bill-by-bill review to determine if statutory interest may have been owed to any particular medical provider. Indeed, medical providers will have to engage in similar bill-by-bill reviews to ascertain whether they belong to the putative class, an exercise they will unlikely perform in view of the cost and burden involved.

Shady Grove's "alternative class definition" does not cure the problem. Use of terms such as "never disputed," "timely fashion," and "no payment" inherently involves merits determinations of Plaintiff's claims. For example, the 30-day period is not absolute, and can be extended by, *inter alia*, requests for medical verifications. Likewise, "no payment" is conditioned by 11 N.Y.C.R.R. § 65-3.9(a) of Regulation 68 which provides in relevant part: "When a payment is made on an overdue claim, any interest calculated to be due in an amount exceeding $5 shall be paid to the applicant or the applicant's assignee without demand therefor."

Finally, the undersigned counsel for Allstate took the deposition of Shady Grove pursuant to Fed. R. Civ. P. 30(b)(6) last week on January 11, 2012. Although the transcript of the deposition is

---

[2]    During oral argument, Chief Justice Roberts observed, "And when we say, as all of our standing cases have, is that what is required is injury of fact, I understand that to be in contradistinction to injury in law. And when you tell me all that you want to plead is a violation of the statute, that doesn't sound like injury in fact." (Ex. B - Tr. at 31:20-25)

**D**uane**M**orris

The Honorable Nina Gershon, U.S.D.J.
January 17, 2012
Page 3

not available as of the date of this letter, Allstate will present a copy of the transcript at oral argument because the testimony will corroborate Allstate's argument that Shady Grove has no factual bases for the allegations in the Complaint. Specifically, the witness for Shady Grove, Bonita Nolan, testified that she (or to her knowledge, anyone else at Shady Grove) never reviewed, *inter alia*, the following: (i) the Complaint; (ii) any discovery requests from Allstate; (iii) any responses, including interrogatory responses (in violation of Fed. R. Civ. P. 33) to Allstate's discovery requests, and (iv) the documents production served by Mr. Spadaro. She further testified that she had only a couple of communications with Mr. Spadaro since 2006. She did not know that the initial Complaint was dismissed and that the case had been appealed to the Second Circuit or U.S. Supreme Court. To her knowledge, no one at Shady Grove authorized those appeals.

Ms. Nolan basically had no personal, first-hand knowledge of the factual bases for the allegations in the Complaint and merely received information from Mr. Spadaro, who admitted that the class action allegations were nothing more than legal conclusions. While she was familiar with the situation of the late payments relating to Maryland PIP, she admitted she had no knowledge with regard to New York State PIP. The lack of factual bases for the Complaint (and indeed after discovery) presents fatal issues with regard to lack of subject matter jurisdiction as well as class certification under the standards of *Twombly* and *Iqbal* and Rule 23. *See also Wal-Mart Stores, Inc. v. Dukes,* ___ U.S. ___, 131 S. Ct. 2541, 2551 (2011) (enforcing the rigorous analysis requirement of Rule 23).

The foregoing arguments will be included in Allstate's motion in opposition to class certification, but in the interest of full and immediate disclosure, the Court should be aware of the foregoing in anticipation of the oral argument on January 24th.

Thank you for Your Honor's attention.

Respectfully Submitted,

**DUANE MORRIS LLP**

Andrew T. Hahn, Sr.
Partner

Attachments
cc:     John S. Spadaro, Esq. (Via ECF and E-mail)
        James Yu, Esq. (Via ECF and E-mail)

# Exhibit A

Westlaw.

401 Fed.Appx. 884, 2010 WL 4561378 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 401 Fed.Appx. 884, 2010 WL 4561378 (C.A.5 (La.)))**

▷
This case was not selected for publication in the
Federal Reporter.

Not for Publication in West's Federal Reporter See
Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also Fifth Circuit Rules
28.7, 47.5.3, 47.5.4. (Find CTA5 Rule 28 and Find
CTA5 Rule 47)

United States Court of Appeals,
Fifth Circuit.
In re: KATRINA CANAL BREACHES LITIGA-
TION
Gladys Chehardy; Chuck Morris; Day Morris;
Spencer Falou; Heather Falou; et al.,
Plaintiffs–Appellants
v.
State Farm Fire & Casualty Company; Allstate In-
demnity Company; Allstate Insurance Company;
American Insurance Company; Lafayette Insurance
Company; Liberty Mutual Fire Insurance Company;
Chubb Custom Insurance Company; AAA
Homeowners Auto Club Family Insurance Com-
pany; Louisiana Citizens Property Insurance Corp.;
Lexington Insurance Company; Encompass Insur-
ance Company of America; Aegis Security Insur-
ance Company; Great Northern Insurance Com-
pany; Hanover Insurance Company; Standard Fire
Insurance Company, Defendants–Appellees.

No. 09–31071.
Nov. 11, 2010.

**Background:** Plaintiff insureds requested certifica-
tion of class action against various insurers for al-
leged violations of Louisiana law requiring settle-
ment or offer of settlement of claims within 30 days
of receipt of notice of loss. The United States Dis-
trict Court for the Eastern District of Louisiana
denied class certification, and insureds appealed.

**Holdings:** The Court of Appeals held that:

(1) questions of law or fact common to putative
class of insureds' did not predominate over ques-
tions affecting individual class members, and
(2) district court had no obligation to notify putat-
ive class members of decision to deny certification
of class or to advise members of their individual
rights.

Affirmed.

West Headnotes

**[1] Federal Civil Procedure 170A ⚖═182.5**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represen-
ted
                170Ak182.5 k. Consumers, purchasers,
borrowers, and debtors. Most Cited Cases
    Questions of law or fact common to putative
class of insureds' did not predominate over ques-
tions affecting individual class members, and thus,
certification of class was not appropriate on in-
sureds' penalty claims against various insurers
based on alleged violation of Louisiana law requir-
ing settlement or offer of settlement of claims with-
in 30 days of receipt of proof of loss; each insured's
claim turned on reasonableness of insurer's conduct
in deciding their individual claim, which was fact-
specific inquiry that would vary based on individual
circumstances of each claim, including nature of
and extent of damage, where and how insured was
paid and for what type of damage, whether insurer
received timely notice of claim, and whether any
payment was sufficient and timely. Fed.Rules
Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.; LSA–R.S.
22:658.

**[2] Federal Civil Procedure 170A ⚖═177.1**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

401 Fed.Appx. 884, 2010 WL 4561378 (C.A.5 (La.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 401 Fed.Appx. 884, 2010 WL 4561378 (C.A.5 (La.)))

170AII(D)2 Proceedings
  170Ak177 Notice and Communications
    170Ak177.1 k. In general. Most
Cited Cases
  District court had no obligation to notify putative class members of decision to deny certification of class in action against various insurers, or to advise members of their individual rights. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**885 Calvin Clifford Fayard, Jr., Esq., Senior Trial Attorney, Fayard & Honeycutt, A.P.C., Denham Springs, LA, Joseph M. Bruno, Bruno & Bruno, L.L.P., New Orleans, LA, Norval Francis Elliot, III, Esq., N. Frank Elliot III, L.L.C., Lake Charles, LA, for Plaintiffs–Appellants.

Wayne Joseph Lee, Esq., Stephen Glenn Bullock, Mary Lue Dumestre, Lauren E. Godshall, Stone, Pigman, Walther & Wittmann, L.L.C., Judy Y. Barrasso, Edward Robert Wicker, Jr., H. Minor Pipes, III, Steveo W. Usdin, Barrasso, Usdin, Kupperman, Freeman & Sarver, L.L.C., Alan J. Yacoubian, Neal J. Favret, Johnson, Johnson, Barrios & Yacoubian, John W. Waters, Jr., Bienvenu, Foster, Ryan & O'Bannon, L.L.C., Robert I. Siegel, Gieger, Laborde & Laperouse, L.L.C., Maura Z. Pelleteri, Krebs, Farley & Pelleteri, P.L.L.C., Ralph S. Hubbard, III, Seth Andrew Schmeeckle, Esq., Lugenbuhl, Wheaton, Peck, Rankin & Hubbard, New Orleans, LA, Charles Louis Chassaignac, IV, Esq., Porteous, Hainkel & Johnson, L.L.P., Emile C. Rolfs, III, Esq., Breazeale, Sachse & Wilson, L.L.P., Baton Rouge, LA, Richard L. Fenton, Steven M. Levy, Alan Scott Gilbert, Kevin Peter Kamraczewski, Sonnenschein, Nath & Rosenthal, L.L.P., Chicago, IL, Kelly C. Bogart, Lawrence J. Duplass, Duplass, Zwain, Bourgeois, Pfister & Weinstock, A.P.L.C., William J. Wegmann, Jr., Wegmann & Adams, L.L.C., Metairie, LA, Daniel Winthrop Nelson, Esq., Melanie L. Katsur, Esq., Gibson, Dunn & Crutcher, L.L.P., Washington, DC, Richard Joseph Doren, Gibson, Dunn & Crutcher, L.L.P., Los Angeles, CA, Wystan Michael Ackerman, Stephen

E. Goldman, Robinson & Cole, L.L.P., Hartford, CT, for Defendants–Appellees.

Appeal from the United States District Court for the Eastern District of Louisiana, USDC No. 2:05–CV–4182.

Before JONES, Chief Judge, and REAVLEY and HAYNES, Circuit Judges.

PER CURIAM: [FN*]

> FN* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

**886 **1 Plaintiffs–Appellants, who are policy holders of the various insurance company defendants, appeal following the district court's grant of a motion to strike class action allegations and subsequent dismissal of Plaintiffs' case. When the Plaintiffs declined the opportunity to refile their claims as individual actions, the district court dismissed. The claims stem from the Hurricane Katrina disaster in Louisiana. Plaintiffs sought, *inter alia,* certification of statutory penalty claims for the Defendants' alleged bad faith in adjusting their Katrina-related insurance claims. The district court held that class certification was improper because the claims required an analysis of myriad individualized, fact-specific issues. We AFFIRM.

The district court's denial of class certification is reviewed for an abuse of discretion, but we review the legal standards employed by the court de novo. *See Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.,* 597 F.3d 330, 334 (5th Cir.2010).

[1] "All classes must satisfy the four baseline requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation." *Anderson v. U.S. Dep't of Housing & Urban Dev.,* 554

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

401 Fed.Appx. 884, 2010 WL 4561378 (C.A 5 (La.))
**(Not Selected for publication in the Federal Reporter)**
(Cite as: 401 Fed.Appx. 884, 2010 WL 4561378 (C.A.5 (La.)))

F.3d 525, 528 (5th Cir.2008); *see* FED.R.CIV.P. 23 . In addition, a putative class must also be one of the three types of class actions listed in Rule 23(b). *See Maldonado v. Ochsner Clinic Found.,* 493 F.3d 521, 523 (5th Cir.2007). The issue in this appeal is whether the Plaintiffs' proposed class satisfied Rule 23(b)(3), which requires the court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members[.]" FED.R.CIV.P. 23(b)(3). The predominance inquiry is more demanding than the Rule 23(a) question of commonality. *O'Sullivan v. Countrywide Home Loans, Inc.,* 319 F.3d 732, 738 (5th Cir.2003). The court must assess "how the matter will be tried on the merits, which 'entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class.' " *In re Wilborn,* 609 F.3d 748, 755 (5th Cir.2010) (citation omitted).

The Plaintiffs' underlying claims in this case are based on the Defendants' duties under state law to pay or make written offer to settle claims within thirty days after receipt of satisfactory proof of loss. *See* LA.REV.STAT. ANN. § 22:658 (now codified at LA.REV.STAT. ANN. § 22:1892). A cause of action for statutory penalties for violation of § 22:658 "requires a showing that (1) an insurer has received satisfactory proof of loss, (2) the insurer fails to tender payment within thirty days of receipt thereof, and (3) the insurer's failure to pay is arbitrary, capricious or without probable cause." *La. Bag Co. v. Audubon Indem. Co.,* 999 So.2d 1104, 1112–13 (La.2008). Penalties may not be assessed unless "the facts negate probable cause for nonpayment." *Id.* at 1114 (internal quotation marks and citation omitted). This standard requires an assessment of the reasonableness of the defendant insurer's conduct, and "when there are substantial, reasonable and legitimate questions as to the extent of an insurer's liability or an insured's loss, failure to pay within the statutory time period is not arbitrary, capricious or without probable cause." *Id.*

**\*\*2** The district court held, and we agree, that class certification is not appropriate in this case because each Plaintiff's claim turns on the reasonableness of the Defendants' conduct in deciding whether to make payments to each individual Plaintiff. Such a determination is a fact-specific inquiry that will vary based on the individualized circumstances of each claim. Plaintiffs contend that the Defendants' bad faith **\*887** may be adjudicated on a class-wide basis because they have alleged an over-arching scheme among the Defendants with respect to adjusting Hurricane Katrina claims. But even in the face of such a scheme, individualized issues will predominate, such as the nature and extent of a class member's damage, whether and how much a class member was paid and for what type of damage, and whether any payment was sufficient and timely. There will also be issues as to whether the class member fulfilled his duty to timely notify the insurer of the claim and whether there was sufficient proof of loss. All of these individual inquiries will be part of the overall determination of whether the insurer acted arbitrarily and capriciously, and therefore defeat class certification. *See, e.g., Maldonado,* 493 F.3d at 525 (holding that class certification not appropriate where reasonableness of medical fees charged to class members depended on multiple factors).

Plaintiffs contend that the reasonableness of Defendants' actions may be determined on a class-wide basis by focusing on a minimal standard of conduct under state law rather than merely the desired conduct of the insurers. We are unpersuaded. As noted by the district court, Plaintiffs' distinction between these purported standards for reasonableness is not supported by legal authority. Moreover, the Louisiana Supreme Court has defined the necessary inquiry into reasonableness as dependent "on the facts known to the insurer at the time of its action." *La. Bag,* 999 So.2d at 1114. This inquiry will necessarily involve detailed and individualized considerations of each class members' claim. Furthermore, because the state law provides an adequate basis for consideration of the case, Plaintiffs' re-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

401 Fed.Appx. 884, 2010 WL 4561378 (C.A.5 (La.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 401 Fed.Appx. 884, 2010 WL 4561378 (C.A.5 (La.)))

quest for certification of the issues in this appeal to the Louisiana Supreme Court fails. *See In re Katrina Canal Breaches Litig.,* 495 F.3d 191, 208 n. 11 (5th Cir.2007).

Plaintiffs also argue that certification is proper in order to avoid a disparity between the federal courts and the Louisiana state courts, which have permitted similar class actions. Federal class action certification is controlled by federal procedural rules, notwithstanding state law. *See Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.,* —— U.S. ——, 130 S.Ct. 1431, 1437, 176 L.Ed.2d 311 (2010). Because Rule 23 governs the instant actions, and we conclude that the district court correctly applied the rule, reliance on state court decisions in support of certification is unavailing.

[2] Finally, Plaintiffs argue that the district court erroneously denied their request to order Defendants to notify individual policyholders of the district court's decision and the existence of their individual rights. They contend that the court was empowered to order such notice by FED.R.CIV.P. 23(d)(1)(B). Even assuming that the district court had the power to issue such an order, which we do not decide, there is nothing that requires the court to order notice of the denial of class certification, and we find no abuse of discretion in the court's refusal to do so. *See, e.g., Pearson v. Ecological Science Corp.,* 522 F.2d 171, 177 (5th Cir.1975) ("[W]here a court has ruled under Rule 23(c)(1) that an action cannot properly be maintained as a class action the notice requirements of Rule 23(e) do not apply ...."); *see also Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 2153, 40 L.Ed.2d 732 (1974) ("The usual rule is that a plaintiff must initially bear the cost of notice to the class.").

**3 AFFIRMED.

C.A.5 (La.),2010.
In re Katrina Canal Breaches Litigation
401 Fed.Appx. 884, 2010 WL 4561378 (C.A.5 (La.))

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit B

Official - Subject to Final Review

1

1          IN THE SUPREME COURT OF THE UNITED STATES

2     - - - - - - - - - - - - - - - x

3     FIRST AMERICAN FINANCIAL          :

4     CORPORATION, SUCCESSOR IN INTEREST:

5     TO THE FIRST AMERICAN CORPORATION,:

6     ET AL.,                           :   No. 10-708

7               Petitioners            :

8          v.                           :

9     DENISE P. EDWARDS                 :

10    - - - - - - - - - - - - - - - x

11                        Washington, D.C.

12                        Monday, November 28, 2011

13

14          The above-entitled matter came on for oral

15    argument before the Supreme Court of the United States

16    at 10:03 a.m.

17    APPEARANCES:

18    AARON M. PANNER, ESQ., Washington, D.C.; on

19       behalf of Petitioners.

20    JEFFREY A. LAMKEN, ESQ., Washington, D.C.; on

21       on behalf of Respondent.

22    ANTHONY A. YANG, ESQ., Assistant to the Solicitor

23       General, Department of Justice, Washington, D.C.; for

24       United States, as amicus curiae, supporting

25       Respondent.

Official - Subject to Final Review

2

1                    C O N T E N T S

2    ORAL ARGUMENT OF                                PAGE

3    AARON M. PANNER, ESQ.

4        On behalf of the Petitioners                  3

5    ORAL ARGUMENT OF

6    JEFFREY A. LAMKEN, ESQ.

7        On behalf of the Respondent                  25

8    ORAL ARGUMENT OF

9    ANTHONY A. YANG, ESQ.

10       For United States, as amicus curiae,         47

11          supporting Respondent

12   REBUTTAL ARGUMENT OF

13   AARON M. PANNER, ESQ.

14       On behalf of the Petitioners                 57

15

16

17

18

19

20

21

22

23

24

25

Official - Subject to Final Review

3

1                    P R O C E E D I N G S

2                                    (10:03 a.m.)

3            CHIEF JUSTICE ROBERTS:   We will hear

4    argument first this morning in Case 10-708, First

5    American Financial Corporation v. Edwards.

6            Mr. Panner.

7            ORAL ARGUMENT OF AARON M. PANNER

8                ON BEHALF OF THE PETITIONERS

9            MR. PANNER:   Mr. Chief Justice, and may it

10   please the Court:

11           Article III requires a private plaintiff to

12   show injury in fact, which means at a minimum that the

13   alleged illegal conduct made her worse off.   Factual

14   injury does not automatically follow from violation of a

15   statutory duty owed to the plaintiff, and Ms. Edwards

16   has not alleged the type of harm alleged by plaintiffs

17   in the common law cases that she invokes -- no

18   misappropriation of her property, no loss of desired

19   opportunity or benefit, no injury to reputation.

20           JUSTICE BREYER:   Let me just get -- use an

21   example, a hypothetical based on the next case, really:

22   I was thinking Congress passes a law, says you can't

23   phone people between 7:00 at night and 7:00 in the

24   morning and try to sell them something, okay?   That's

25   the law.   And anyone who gets such a phone call gets

Official - Subject to Final Review

4

1      $500 in damages automatically if they sue in court if

2      they receive such a call.

3              The harm was getting the call.  So my

4      grandmother, who is always complaining no one ever calls

5      her, loved the telephone call.  She loved it.  The best

6      thing happened to her in a month, okay?

7              Now, can she sue?

8              MR. PANNER:  No, Your Honor.  If she does

9      not have actual injury, the fact of the statutory

10     violation would not give rise to standing in that case.

11     Now, it's -- I think it would be quite unlikely that a

12     plaintiff would come before the Court and say:  Actually

13     the statutory violation delighted me; I nevertheless

14     would like my $500.  But if the injury-in-fact

15     requirement means anything, it means that a plaintiff

16     who comes before the Court must have a harm in fact.

17             JUSTICE BREYER:  In other words, if the FDA

18     bans a substance on the ground that 98 percent of the

19     people it hurts, and there is some kind of automatic

20     recovery, $500 anybody who bought the substance because

21     it wasn't supposed to be sold, and she's one of

22     the 2 percent that it helped --

23             MR. PANNER:  Well, Your Honor --

24             JUSTICE BREYER:  -- you can't sue?

25             MR. PANNER:  In the case -- in the case in

5

1    which someone is exposed to a substance that has -- that

2    is illegal, they might well suffer a harm, and the harm

3    might be the exposure to the substance.  And the -- the

4    sort of inquiry that you are looking into, which is even

5    if the exposure ended up not being harmful, would that

6    be a case?

7             JUSTICE BREYER:  Well, here she was exposed,

8    or the plaintiff was exposed, to the kind of transaction

9    that Congress said was harmful as a general matter, just

10   like the example you gave.

11            MR. PANNER:  I don't think so, Your Honor.

12   And the reason is that in this case, the violation -- as

13   her complaint makes clear, she paid the only rate for

14   title insurance available in Ohio.  She does not

15   complain of the quality of the insurance or the service

16   she received.  She does not maintain --

17            JUSTICE SOTOMAYOR:  But, counsel, going

18   back --

19            CHIEF JUSTICE ROBERTS:  I'm sorry.

20            Justice Ginsburg.

21            JUSTICE GINSBURG:  Because she can't prove

22   it at the early stage, and the problem that Congress was

23   concerned about was that you can't tell until the house

24   is going to be sold in the end how adequate the title

25   insurance was.  So Congress is acting on the potential

Official - Subject to Final Review

6

1    that these kind of kickbacks can cause harm.  And this

2    does seem to fit the bill of restitution, unjust

3    enrichment cases, where the plaintiff doesn't have to

4    prove any harm, she just gets back what the defendant

5    should not have received.

6                MR. PANNER:  Your Honor, with respect to

7    unjust enrichment cases, those cases reflect

8    circumstances where there is a benefit received at the

9    expense of the plaintiff.  And in -- in the traditional

10   sorts of cases -- unjust enrichment, of course, is an

11   invention as a category that is relatively recent.  But

12   unjust enrichment cases reflect quasi-contract

13   circumstances, where a benefit was conferred, that

14   injustice should have been compensated, so the plaintiff

15   is made worse off in not receiving the benefit or the

16   compensation for the benefit; or a circumstance of

17   constructive trust, where there was property or other

18   right of the plaintiff that was misappropriated and used

19   without the permission of the plaintiff.  So an

20   opportunity or a property was taken away.

21               This is not a case like that, and there is

22   no allegation that there is anything lacking in the

23   insurance that was issued.  This is a circumstance in

24   which Congress may believe that a certain practice as a

25   general matter can tend to bring out -- bring about

Official - Subject to Final Review

7

1    bad -- bad outcomes and can therefore make it unlawful.

2    But the question here is whether this plaintiff has a

3    harm --

4            JUSTICE SOTOMAYOR:  Counsel, are you taking

5    a very broad position that this is an unusual State, it

6    appears, with three or four others, where the States

7    mandate that title insurance be at a fixed price.  But

8    in those States in which there is no such mandate, you

9    seem to be arguing that Congress can't ever presume

10   damages or injury, that even in those cases the

11   plaintiff has to come in and prove that they would have

12   paid less.

13           Is that the position you are taking?

14           MR. PANNER:  No, Your Honor.  The type of

15   injury that is incurred doesn't necessarily have to be a

16   financial one and there could be circumstances where a

17   plaintiff would allege an injury -- and I -- it's

18   important to --

19           JUSTICE SOTOMAYOR:  No, no.  Please tell me,

20   in those States in which insurance is not fixed by the

21   State, what does the plaintiff have to do other than to

22   say, "they didn't disclose to me that there was a

23   kickback and I want the amount I paid for the service"?

24   Do they have to show something more?

25           MR. PANNER:  If the -- I want to -- I'm not

8

1    sure I understand Your Honor's question, but if the

2    question is, there were various rates available and the

3    Plaintiff alleges an overcharge, that they purchased

4    a -- a policy and there was a cheaper policy available,

5    and as a result of the violation --

6             JUSTICE SOTOMAYOR:  So you are in fact

7    arguing very broadly that there is no presumption of --

8    of injury in these cases, that the plaintiff still has

9    to come in and prove --

10            MR. PANNER:  Your -- Your Honor --

11            JUSTICE SOTOMAYOR:  -- that in fact they

12    would have gotten a cheaper -- a cheaper policy?

13            MR. PANNER:  Your Honor, the -- the

14    plaintiff would have to allege in the complaint and then

15    eventually show that there was some injury.  It doesn't

16    have to be a financial injury.

17            JUSTICE SOTOMAYOR:  Same thing with nominal

18    damages and statutory damages?  You're -- you're taking

19    a very broad position now.

20            MR. PANNER:  I don't think so, Your Honor,

21    because again the question for purposes of standing, the

22    question for purposes of the ability of a plaintiff to

23    come into court, is to show that they have some injury

24    in fact, that there is some harm, some way in which they

25    were made worse off.  This plaintiff --

Official - Subject to Final Review

9

1          JUSTICE SCALIA:  That's not so
2   extraordinary.  It is what has to be shown in -- in
3   Sherman Act cases, right?  Contracts and combinations
4   in -- in restraint of trade are unlawful; but in order
5   to recover under the Sherman Act, you have to show not
6   only that it was unlawful, but that you were harmed by
7   it.
8          MR. PANNER:  That's true.  That's certainly
9   the norm in all sort of tort -- tort cases.
10          JUSTICE KENNEDY:  I was going to ask you,
11   along that line, are there any trust cases that -- that
12   Respondents or the government could cite in which a
13   party can go into court alleging that the market has
14   been distorted, even though that person has no damage?
15   Anything like that in the antitrust?  What would be
16   their closest case?
17          MR. PANNER:  Well, Your Honor, I'm not
18   sure -- I did not see any of the cases that they cited
19   involving the trust -- the trust circumstance --
20          JUSTICE KENNEDY:  Yes.
21          MR. PANNER:  -- where there was that sort of
22   vague allegation.  The trust cases I think actually are
23   a good illustration of the type of injury that is
24   required.  We are talking about trust, not antitrust
25   now.

Official - Subject to Final Review

10

 1            JUSTICE KENNEDY:  Right.

 2            MR. PANNER:  But the trust cases involve a

 3    circumstance, the -- I think that the plaintiff here

 4    kind of gives the game away by, in the -- when talking

 5    about the Michoud case, using the phrase "the plaintiff

 6    may sue," and of course that's not what the case says.

 7    What the case says is that a -- that a beneficiary can

 8    come into court and say:  The trust has violated the

 9    duty to me; I want to unwind the transaction to get the

10    benefit that I would have gotten had the trustee behaved

11    in the way required.  So in those cases involving

12    trustees, for example, they --

13            JUSTICE KENNEDY:  There is not automatic

14    disgorgement in those --

15            MR. PANNER:  There could be automatic

16    disgorgement, Your Honor.  But again that reflects the

17    lost value of what was paid for in terms of the -- of

18    the --

19            JUSTICE SCALIA:  Well, but --

20            JUSTICE KAGAN:  Mr. Panner, I thought --

21            JUSTICE SCALIA:  -- let -- let's assume that

22    a trustee acts on its own interest and -- and sells

23    property.  But let's assume that he gets top dollar for

24    that property, so that the beneficiary hasn't really

25    been deprived of anything.  What is the injury to the

Official - Subject to Final Review

11

1    beneficiary?

2                MR. PANNER:  Well, the injury to the

3    beneficiary in that circumstance, Your Honor, is that

4    the trustee would have misappropriated an opportunity

5    that belonged to the beneficiary.  In the cases

6    that are -- in the ordinary case, then, the beneficiary

7    has the option to say, I would like to unwind that or

8    get the benefit that the trustee got, if there was

9    self-dealing.  But in a circumstance where a trustee

10   sells, for example, a piece of property and the -- and

11   the claim is one for restitution to try to unwind the

12   transaction that was done, it's the option of the

13   beneficiary to say:  You know what, maybe I am wrong but

14   I think I would be better off if I could undo that

15   transaction.

16                So it's a very conventional kind of harm

17   where someone believes that their property was -- was

18   taken away from them and used in a way to their

19   detriment, and they are therefore seeking relief.

20                JUSTICE SOTOMAYOR:  So what more does this

21   plaintiff have to allege other than, if I had been told

22   that this was a prearranged, tied product between the

23   mortgage and the title company, but that I had a right

24   to get an untied product even at the same price, and I

25   would have exercised that right if I had known -- would

Official - Subject to Final Review

1    that be enough?

2            MR. PANNER:  That might be enough, Your

3    Honor.  But that's exactly what she didn't allege.

4            JUSTICE SOTOMAYOR:  Would that be enough

5    in -- in Justice Breyer's example, of someone who says,

6    I received a call at midnight and it bothered me?

7            MR. PANNER:  Yes, I think that certainly

8    would be enough, absolutely.  The -- the point is that

9    this complaint abstracted away any such particularized

10   claim for a very particular purpose, which was that in

11   order to maintain this case as a class action the basis

12   of harm could not be anything personal or individual to

13   this plaintiff.

14           JUSTICE SOTOMAYOR:  So you go back to your

15   position that Congress has no power to give a cause of

16   action on the basis of a statutory violation in which it

17   is presuming injury?

18           MR. PANNER:  That is correct, Your Honor.

19   The -- what Congress cannot do is to confer on a

20   particular plaintiff an injury that is constitutionally

21   sufficient under Article III.  I think this Court has

22   made clear that Congress cannot do that and that the

23   existence of a statutory right by itself, even the

24   invasion, the violation of the statutory right does not

25   create injury for constitutional purposes.  Injury --

Official - Subject to Final Review

13

1          JUSTICE SOTOMAYOR:  Well, certainly you

2   couldn't -- you couldn't sue.  But if I paid money that

3   I would have -- and that I'm entitled to get back, then

4   I have been injured, because --

5          MR. PANNER:  Well, Your Honor, you paid

6   money -- in this case the plaintiff paid money for a

7   title insurance policy which she received.  She paid at

8   -- at the legally required rate, and she makes no

9   complaint about the policy, nor does she claim that it

10  would have mattered to her --

11         JUSTICE ALITO:  Could I ask you to clarify

12  something?  What could a plaintiff who purchases title

13  insurance in Ohio allege that would be sufficient to

14  provide standing?

15         MR. PANNER:  Well, certainly if a plaintiff

16  said that the -- that the manner in which the title

17  insurance was provided had delayed her closing or that

18  there were procedures that were --

19         JUSTICE ALITO:  No, what could be done --

20  okay.  Go ahead.

21         MR. PANNER:  -- that there was something

22  about the service that she received as a result of

23  the -- the referral to a particular title insurer,

24  again, assuming that this is a violation, which we

25  don't -- we don't think it is.  But -- but assuming that

14

1    it is, that --

2             JUSTICE ALITO:  So you could -- the

3    plaintiff could allege some kind defective service at

4    the time when the title insurance was purchased?  There

5    really is no service provided at that time, is there?

6             MR. PANNER:  Actually, most --

7             JUSTICE ALITO:  You get a title insurance

8    policy and that's it; and you don't know whether -- you

9    don't know what will happen if there is some problem

10   alleged with the title at some point down the road.

11            MR. PANNER:  Well, that's really -- the --

12   the risk of that is really on the title insurer, which

13   is why the title insurer has no incentive whatsoever to

14   encourage poor service by a title insurance agent.

15            JUSTICE KENNEDY:  Well, that -- that leads

16   me to this point.  I thought -- I never thought of title

17   insurance companies as being fungible, and some were

18   very, very good about narrowing the exceptions, about

19   working with the seller of the property, if you

20   represented the buyer, to get rid of the exceptions.

21   And so I'm not sure that it's just a question of a

22   policy versus no policy.  There's a -- there's a quality

23   to the -- to the research they do.

24            And the next -- and related to that is this:

25   you -- you put the case as if the price is going to be

1   the same for the insurance.  A, I think there is nothing

2   in the -- in the State law that permits the insurance

3   company to get -- to set a lower rate; and second, don't

4   the title companies charge other fees, title search

5   and so forth, other fees in addition to the price of the

6   insurance?  And those other fees, arguably -- I know she

7   didn't allege any damage -- but those other fees

8   arguably are too high because of this fixed market.

9           MR. PANNER:  Well, Your Honor, that --

10          JUSTICE KENNEDY:  Now, she didn't allege

11   that.  I know that.

12          MR. PANNER:  She didn't allege it, and I

13   think that's critical, because the -- the issue is not

14   whether it's conceivable that an injury could occur from

15   the violation.  It could.  And what you have indicated

16   about difficulty clearing objections to a title, for

17   example, if there was a problem that she had with

18   respect to that and she believed it was the case, that

19   would actually be the job of the title agent, which --

20   and there is no allegation that she was improperly

21   referred to the title agent.

22          So the insurer is issuing -- underwriting

23   the policy and bears the residual risk, but it's the

24   agent that is actually engaged with the -- with the

25   plaintiff here.  And there, the agent's name here was

Official - Subject to Final Review

1    Tower City.

2            JUSTICE BREYER:   Suppose Congress makes a

3    finding; this is the finding:   We think that lawyers or

4    whoever is engaged in these who hire title insurance

5    companies should hire the best one on the merits, not on

6    the basis of which one will give them the biggest

7    kickback.   We think that's so because that will help

8    keep people secure.   Everyone in such -- who buys a

9    house will feel more secure knowing that the market

10   worked there.   We can't prove who feels insecure and who

11   doesn't.   We think in general they would, and so we give

12   everybody the right to recover $500 if they are injured,

13   where the injury consists of being engaged in a

14   transaction where the title insurance company was not

15   chosen on the merits, but was chosen in whole or in part

16   on the basis of the kickback.

17            And they write that right into the statute,

18   so therefore there is no doubt that the plaintiff here

19   suffered the harm that Congress sought to forbid.   That

20   harm was being engaged in a transaction where the title

21   insurance company was not chosen on the merits, but

22   partly in terms of a kickback.   Now, what in the

23   Constitution forbids Congress from doing that?

24            MR. PANNER:   The Constitution, Article III,

25   as this Court has interpreted it, requires that a

Official - Subject to Final Review

1    plaintiff that comes into court must have suffered an

2    injury in fact, and Congress cannot create that injury

3    legislatively.  Otherwise, the Congress can enlist the

4    courts for regulatory purposes that are unrelated to the

5    core function of the Court as this Court has articulated

6    it.

7              JUSTICE KAGAN:  Mr. Panner, suppose there

8    were a contract between Ms. Edwards and Tower and the

9    contract had a no-kickback clause, not one that

10   suggested that Ms. Edwards had to show any kind of

11   injury, greater cost or lesser service, but just you

12   can't have any kickbacks.  Can she sue on that contract?

13             MR. PANNER:  Well, if it was a negotiated

14   agreement and it was -- it was one where the parties had

15   given value for that assurance, then that would

16   represent something that there had been a judgment in

17   advance by this particular individual that that was

18   something that was a performance that she was willing to

19   pay for and a promise that meant something to her, and

20   so that would potentially be a different case.

21             JUSTICE KAGAN:  And now suppose that

22   Congress passes a law and says every contract of this

23   kind has to have such a provision in it.

24             MR. PANNER:  Right.

25             JUSTICE KAGAN:  Would she now have standing?

Official - Subject to Final Review

1                   MR. PANNER:  Most likely not, Your Honor.

2     And the reason is that it's the difference between a

3     contract that the parties engage in, where there would

4     be a -- if there's a negotiated contract, it would be

5     reasonable for the Court to say, well, there's value

6     attached to the rights that the parties have bargained

7     for here.  But it's different if Congress is using it as

8     a mechanism to create injury legislatively, and in that

9     circumstance the court would still have to determine

10    whether there was injury in fact that would allow the

11    Plaintiff to get into court.  But it's a different case.

12                  JUSTICE SCALIA:  Could Congress decree that

13    the agent in this case shall be an agent of the

14    purchaser rather than an agent of the title insurance

15    company, as is done in real estate, I think?  The real

16    estate broker must be an agent of the seller and not of

17    the purchaser.  Can it establish a trust relationship

18    between the purchaser here and the person selecting the

19    title insurance company?

20                  MR. PANNER:  Well, I think that Congress

21    could potentially create a trust relationship.

22                  JUSTICE SCALIA:  And if it did, would the

23    violation of that trust relationship constitute injury

24    for -- for Article III purposes?

25                  MR. PANNER:  Well, it would depend, Your

Alderson Reporting Company

Official - Subject to Final Review

19

1   Honor.  Not per se.  It would depend on whether there

2   was some way in which that violation caused an injury in

3   fact.  So, for example -- first of all, to the extent

4   that there was some --

5        JUSTICE SCALIA:  We don't require injury in

6   fact for most breaches of trust, do we?

7        MR. PANNER:  You do, Your Honor.  That is to

8   say that in the case of any of the examples that the

9   plaintiff has cited there is an underlying interest, an

10  antecedent interest, a concrete interest in property or

11  in an economic opportunity, paid-for services of an

12  agent, and it is that concrete interest which is invaded

13  by the -- by the alleged violation of the responsibility

14  of trust.

15       But of course here you don't even have that

16  relationship of trust.  As --

17       JUSTICE SCALIA:  Well, I understand, but I'm

18  just saying that that concrete interest can be created

19  by Congress instead of being created by contract.  What

20  difference does it make?  If you become a trustee by

21  contract you get one result, but if you are a trustee by

22  government decree so that you must be a trustee,

23  contract or not, somehow the situation changes?

24       MR. PANNER:  I don't -- I don't think the

25  situation would change.  I guess what I'm saying is that

Official - Subject to Final Review

1   even -- I don't see any of the common law cases

2   involving trusts, trustees, as involving recoveries or

3   suits in the absence of what this Court would certainly

4   consider to be an injury in fact, that is to say some

5   harm to a concrete interest that exists apart from the

6   statutory duty or the common law duty.

7           JUSTICE KAGAN:  Mr. Panner, in response to

8   Justice Scalia's questions and my questions, you are

9   suggesting that there is a difference depending on what

10  the source of the law is.  If the source of the right is

11  a contract, there is one result.  If the source of the

12  right is a statute, there is another result.  And I

13  thought that that was very much -- that is -- that's

14  very much inconsistent with our case law, and

15  specifically with Lujan.

16          MR. PANNER:  I certainly didn't mean to say

17  that, Your Honor, so let me try to clarify.  The

18  question was, there are circumstances in which the legal

19  relationship is such that there could be -- let me back

20  up.

21          The question is whether there is an injury

22  in fact, that is to say a harm that exists as a factual

23  matter, and those interests certainly can be reflected

24  by the legal duties that are created.  So, for example,

25  there are legal duties in contract that are intended to

1   protect the interests of the contracting parties.  There

2   are legal duties under the law of trust that are

3   intended to protect the beneficiary.

4        But this Court has frequently reflected the

5   fact that there is the question of the violation, but

6   then there is separately the question of the injury.

7   And the point that I'm making -- and it should be the

8   same answer with respect to your question and

9   Justice Scalia's -- is if the mere fact of a violation

10  of a duty does not create injury per se, and none of the

11  cases reflect that, and that is the proposition that

12  plaintiff relies on here, precisely because of what she

13  alleged and what she is attempting, the type of case

14  that she is attempting to bring.  She is attempting to

15  bring a case in which the statutory violation is the

16  injury.  No other injury is required.  She very

17  straightforwardly says, it does not matter if there is

18  any economic harm, it does not matter if there is any

19  quality difference, it does not matter if there is any

20  consequential effect on me at all.

21       JUSTICE KAGAN:  I'm not sure that that's the

22  right understanding of her complaint.  She is saying:  I

23  don't have to prove those things because there's been a

24  judgment made that these kinds of practices tend to

25  decrease service and tend to increase price and

Official - Subject to Final Review

1    therefore I don't have to prove those matters.  And

2    that's the exact same judgment that is made in the trust

3    cases, for example.

4              MR. PANNER:  Again, I don't think that the

5    trust cases can be fairly read to say that, Your Honor.

6    But the key point is that there is a distinction between

7    what Congress -- the statutory duties that Congress can

8    impose and the manner in which Congress can choose to

9    have those enforced -- well --

10             JUSTICE GINSBURG:  Suppose she appended to

11   her complaint an affidavit by a well-respected economist

12   that says:  Congress was right; these kind of

13   arrangements will have an adverse effect on the people

14   who are purchasing title insurance, and goes through all

15   kinds of analyses that show that.  Would that be

16   adequate then?

17             MR. PANNER:  Well, at the pleading stage it

18   might be, Your Honor.  That is to say that if the

19   question were whether there was an allegation, certainly

20   it's possible that there could be a sufficiently

21   concrete allegation in a complaint that there was that

22   sort of an impact, but -- and this is critical -- not

23   only was that not alleged here, but the mere fact that

24   there is a statutory duty does not reflect that's the

25   judgment or, you know, the fact that there's been any

Official - Subject to Final Review

23

1   sort of many systemic effect.

2          Congress has broadly prohibited practices

3   involving kickbacks and the paradigm case has nothing to

4   do with a situation in which a title insurance agent is

5   issuing a title insurance policy for an underwriter.

6          Now, it's not to say that Congress can't

7   pass a broader prohibition and -- you know, and require

8   that it be enforced.  Well, Congress can pass a broader

9   prohibition and then the executive could enforce it.

10  But what Congress cannot do is to dictate in advance

11  that a particular practice has caused injury to a

12  particular plaintiff.

13         JUSTICE KAGAN:  Counsel, I'm still having

14  problems.

15         JUSTICE KENNEDY:  Just following up Justice

16  Ginsburg's hypothetical, suppose the Congress works with

17  economists and concludes there is a reasonable

18  probability that if there were no kickbacks there would

19  be a more competitive market, there would be lower

20  prices for some of the escrow fees, some of the

21  collateral fees in addition to the title insurance.  And

22  the plaintiff then alleges that there is this reasonable

23  probability that there would be a more efficient market,

24  resulting in cost savings.  Would that be enough?

25         MR. PANNER:  Well, Your Honor, there has to

Official - Subject to Final Review

24

1   be a connection between the violation alleged and the

2   harm that ensues, and so a general understanding that --

3               JUSTICE KENNEDY:  Well, the person alleges:

4   And I was in this market and I might have -- there is a

5   reasonable probability that I could have had a lower

6   price, according to economic theory.

7               MR. PANNER:  Well -- well, again, that

8   wasn't alleged here.  So the question --

9               JUSTICE KENNEDY:  I'm assuming it's alleged.

10              MR. PANNER:  I understand that, Your Honor.

11  So the question would be particular to the allegations

12  that were made.  In a case like this one, it's in all

13  likelihood a generic allegation that there had been --

14  that there was some sort of systemic effect is -- it

15  would be insufficient.  That would be a speculative sort

16  of claim of harm and that would be really something

17  where if it's a general systemic effect with no

18  traceability between the violation that's alleged and

19  any supposed harm to the plaintiff, that that would be

20  something for the executive.

21              Mr. Chief Justice, if I can reserve --

22              JUSTICE ALITO:  If the plaintiff went

23  further and alleged some harm particular to her,

24  wouldn't that be even more speculative, some economic

25  harm particular to her?  I don't want to take up your

Alderson Reporting Company

Official - Subject to Final Review

25

1    rebuttal time, but --

2                    MR. PANNER:  Thank you, Your Honor.

3                    I think it would depend.  I mean, certainly

4    there are all sorts of circumstances where there is

5    broad systemic harm, but yet the harm to the plaintiff

6    is very clear, if you think about, for example, about

7    price-fixing.

8                    If I could reserve the remainder.

9                    CHIEF JUSTICE ROBERTS:  Thank you,

10   Mr. Panner.

11                   Mr. Lamken.

12                   ORAL ARGUMENT OF JEFFREY A. LAMKEN

13                      ON BEHALF OF THE RESPONDENT

14                   MR. LAMKEN:  Thank you, Mr. Chief Justice.

15   And may it please the Court:

16                   For at least 280 years the law has been

17   clear that when someone breaches a duty of loyalty owed

18   to you by taking a kickback or otherwise introducing a

19   conflict into a transaction, you can sue on the basis of

20   that alone, without showing a further harm in terms of

21   economic loss.  The invasion of your right to

22   conflict-free service was itself a sufficiently concrete

23   and particularized injury in fact, not an abstract and

24   undifferentiated --

25                   JUSTICE SCALIA:  You speak of a duty of

Official - Subject to Final Review

1    loyalty.  There is no duty of loyalty owed here.  It was

2    just a law that said you cannot get -- and I'm not even

3    sure it's proper to call it a kickback.  It's a

4    commission.  These people are agents for the title

5    insurance company and they get a commission on -- on

6    every sale of title insurance that they make.  You can

7    call it a kickback, I suppose.  I don't know why the

8    other side does.  But, but -- but it seems to me a

9    commission.  There is no duty of loyalty.  Isn't the --

10   isn't the seller here the agent of the title insurance

11   company?

12           MR. LAMKEN:  Congress could have made them,

13   the agent, could have, as you pointed out, could have

14   made them a full-fledged fiduciary.  Elevating your

15   interest in having no conflicts whatsoever in the

16   transaction to establish -- -

17           JUSTICE SCALIA:  We'd have a different --

18   we'd have a different case then.  But they didn't do

19   that, did they?

20           MR. LAMKEN:  Congress actually elevated one

21   component of that by giving you a right to -- freedom

22   from a particular conflict of interest, and that is the

23   kickbacks that undermine their incentive to serve your

24   best interest, that undermine their incentive to choose

25   the insurer that provides the best quality and the best

Official - Subject to Final Review

1    service.

2              JUSTICE ALITO:  Well, this is where I have

3    problems with your argument, because this doesn't seem

4    to me to be a fiduciary relationship and I don't see

5    where the duty of loyalty comes from.  And to say that

6    Congress can just impose some attributes of a fiduciary

7    relationship wherever it wants seems rather strange.

8              Let me give you this example.  I take my car

9    to an auto dealer to have -- because it's making a

10   strange sound.  And I say:  Call me up when you figure

11   out what you think is the problem.  And they call me up

12   and they say:  Well, there are certain things wrong with

13   it, and it's going to cost you $1,000.  And I say:

14   Okay, now, thanks for diagnosing the problem; where

15   should I have it fixed?  Should I have it fixed at your

16   shop or should I go to another place and have it fixed?

17   And they say:  Well, have it fixed at our shop.  Now, is

18   there a breach of a duty of loyalty there?

19             MR. LAMKEN:  Well, you might have an

20   interest in getting an honest opinion.  It's just not

21   protected by law.  They are allowed to tell you what

22   they want to tell you because you have no protected

23   interest in their opinion.

24             JUSTICE ALITO:  I know.  But we are looking

25   for whether there is an injury in fact.  Put aside the

Official - Subject to Final Review

1    question of whether there is a breach of the duty in

2    law.   There is allegedly here.   I just don't see where

3    there is an injury in fact, because I know -- I'm an

4    idiot if I don't realize -- that they have a strong

5    economic incentive to say:   Come have it fixed at my

6    place.

7                MR. LAMKEN:   Well, in fact, Your Honor,

8    Congress is entitled to elevate your interest in

9    obtaining honest judgments or conflict-free advice to

10   legal protection.   Whether you would be an idiot in

11   accepting it or expecting it in the first instance, they

12   can take that relationship and make it confidential and

13   make it an honest one, even if you hadn't expected that

14   in the first place.

15               JUSTICE SCALIA:   Well, the issue isn't

16   whether they can afford it legal protection.   They

17   certainly can.   And there can be suits by -- by the

18   Federal government or I think under this statute even by

19   State, State attorneys general.   The issue isn't whether

20   Congress can achieve that result.   It's whether they can

21   achieve it by permitting private suits.

22               MR. LAMKEN:   Right.   But the common law was

23   absolutely clear that when someone invaded your right to

24   a conflict-free transaction, invaded your right not to

25   have kickbacks in your transactions, you didn't have to

Official - Subject to Final Review

1    prove that there was an economic consequence.   The

2    invasion of your right not to have conflicts invade that

3    transaction was sufficient.

4            JUSTICE KENNEDY:   Could you tell me, just

5    with Justice Alito's automobile hypothetical, just as a

6    matter of agency law -- I'm a little rusty on this one.

7    If the auto repair people phone and say, and you need

8    two parts and we will purchase those parts for you, and

9    they then purchase parts from a company that they own,

10   under standard agency law could the vehicle owner get

11   disgorgement?

12          MR. LAMKEN:   If they are acting --

13          JUSTICE KENNEDY:   And he·doesn't know, they

14   haven't been informed --

15          MR. LAMKEN:   If that is an agency duty, and

16   we assume that that's an agent; they are acting as agent

17   for the person with the broken car -- the answer is

18   absolutely, without having to show any loss.   And this

19   Court's case in Magruder v. Drury was that type of case,

20   where it was absolutely clear that the plaintiff would

21   not have paid a cent more, the estate would not have

22   paid a cent more if that -- if they had gone elsewhere

23   to make the purchase.

24          JUSTICE SCALIA:   If I take my car to an auto

25   mechanic, he's not my agent.   He's an independent

Official - Subject to Final Review

1    contractor doing business.  He's not my agent.

2                MR. LAMKEN:  That's exactly why I said --

3                JUSTICE SCALIA:  And it's not an agency

4    relation here, either.  It's a customer going to

5    somebody who is an independent contractor.

6                MR. LAMKEN:  Congress imposed one component

7    of the duty that applies to agents and fiduciaries

8    across the board and that is:  Don't take kickbacks that

9    undermine the incentive to obtain the best deal offered

10   a consumer.

11               JUSTICE SCALIA:  It wasn't agents and

12   fiduciaries across the board.  He is neither an agent

13   nor a fiduciary.  And what's the closest case you have

14   to a situation where there is neither an agency

15   relationship nor a trust relationship, and yet this kind

16   of a right to sue without showing damage exists?  What's

17   your -- what's your best shot?

18               MR. LAMKEN:  Well, the law has a number of

19   contexts where you don't have to show financial losses.

20   If somebody defames you, you don't have to -- in your

21   business, you don't have to show that you are

22   financially injured.  That's injury in fact in and of

23   itself.

24               CHIEF JUSTICE ROBERTS:  Well, that gets to a

25   point that I am having trouble getting my arms around.

Official - Subject to Final Review

1   It seems to me what your position is, what you want us

2   to focus on, there are three possible arguments.  One is

3   that there is injury in fact in this case.  I see some

4   of that argument in your briefs.  Two, that Congress

5   presumes injury in fact.  Injury in fact is still

6   required, but that is presumed.  I read that to be

7   perhaps what the trust cases say.  Or three, that injury

8   in fact is not required at all.  Now, which are you

9   arguing?  One, two or three?

10          MR. LAMKEN:  I think our argument is that

11   the invasion of your statutory right to a conflict-free

12   service is itself an injury in fact --

13          CHIEF JUSTICE ROBERTS:  Okay, statutory

14   right.

15          MR. LAMKEN:  But it also has --

16          CHIEF JUSTICE ROBERTS:  Could I?  I'm sorry

17   to interrupt you, but I want to pause on that question.

18   You said violation of a statute is injury in fact.  I

19   would have thought that would be called injury in law.

20   And when we say, as all our standing cases have, is that

21   what is required is injury in fact, I understand that to

22   be in contradistinction to injury in law.  And when you

23   tell me all that you've got or all that you want to

24   plead is violation of the statute, that doesn't sound

25   like injury in fact.

Official - Subject to Final Review

32

1          MR. LAMKEN:  It's injury in fact in the

2    following two senses, Judge -- Mr. Chief Justice.

3    First, all you have to do -- getting a conflict-free

4    referral is itself substantively more valuable than

5    getting one laden by conflict.

6          CHIEF JUSTICE ROBERTS:  Okay.  Now, that

7    goes back to the first proposition.  That is an argument

8    that there is injury in fact here.  So it seems to me

9    that -- I don't mean this in a pejorative sense, but it

10   seems to me that you slide back and forth between one,

11   two, and three, which makes it hard for us to get a

12   decision.

13         MR. LAMKEN:  I think the answer is so long

14   as Congress has entitled you to something of potential

15   value that isn't being denied to every other member of

16   the public in an undifferentiated way, that is

17   sufficient to be injury in fact.

18         CHIEF JUSTICE ROBERTS:  Potential value.

19         MR. LAMKEN:  Potential value.  And it's more

20   valuable --

21         CHIEF JUSTICE ROBERTS:  Now, we said in the

22   Whitmore case, and this is a quote:  "Allegations of

23   possible future injury do not satisfy the requirements

24   of Article III."  Potential value sounds to me like

25   possible future injury.

Official - Subject to Final Review

1            MR. LAMKEN:   In this sense, Your Honor.

2     What you received is substantively less valuable.   All

3     you have to do is ask yourself:   Would I value more

4     advice from somebody who is playing it straight on the

5     financial side or someone who is taking kickbacks from

6     the --

7            CHIEF JUSTICE ROBERTS:   So that is injury in

8     fact?

9            MR. LAMKEN:   That is injury in fact, and

10    there is another way in which it's injury in fact.

11           CHIEF JUSTICE ROBERTS:   So if you tell me

12    what this case is about is whether or not you've shown

13    injury in fact, it's not a significant -- significant

14    case, and your client has to prove that at trial.

15           MR. LAMKEN:   Well, she proved that she got

16    something less valuable.   She got something she was

17    entitled to --

18           CHIEF JUSTICE ROBERTS:   But I thought -- and

19    maybe it's a unique circumstance in this case, but Ohio

20    says this is going to cost you the same no matter what

21    you do.

22           MR. LAMKEN:   That is actually quite

23    incorrect, Your Honor.

24           CHIEF JUSTICE ROBERTS:   Okay.   But then

25    again, that's an argument about was there or was there

34

1    not injury in fact.

2            MR. LAMKEN:  Well, the injury in fact is

3    getting something that is potentially -- not getting

4    something to which the law entitles you, which has

5    potential value to you.  And a conflict-free referral is

6    much more valuable than one laden by conflict.

7            And there is another thing.  We haven't

8    disclaimed the notion entirely.  We haven't -- in fact

9    we believe it is very likely that -- that quality or

10   price suffered as a result of these -- of these

11   conflicts.  But --

12           CHIEF JUSTICE ROBERTS:  That sounds, again

13   to use a word that we have said is inadequate to support

14   standing, that sounds conjectural.

15           MR. LAMKEN:  No, it is not, It's not

16   conjectural at all.  Congress specifically found that

17   these are the consequences.  But the reason --

18           CHIEF JUSTICE ROBERTS:  No, no, no.  We are

19   talking about not what Congress found; but what the

20   injury in fact is.

21           MR. LAMKEN:  Your Honor, so -- -

22           CHIEF JUSTICE ROBERTS:  You will agree,

23   won't you, that the idea that it's certainly possible or

24   whatever your formulation was, that the quality here

25   wasn't good enough or that the entire quality across the

Official - Subject to Final Review

35

1    board might be better, that's conjectural, right?

2             MR. LAMKEN:  No.  Well, Your Honor, it is

3    very hard to prove.  And it was for that exact reason

4    that --

5             CHIEF JUSTICE ROBERTS:  Now we in point --

6    now we are at level two:  It's hard to prove.  So is

7    that your argument, that Congress presumed injury?

8             MR. LAMKEN:  No, Your Honor.

9             CHIEF JUSTICE ROBERTS:  Okay.

10            MR. LAMKEN:  That's why the common law

11   elevated the right to conflict-free services from not

12   being legally protected to legal protection, because it

13   was so hard to figure out, for the judge --

14            JUSTICE BREYER:  What is the -- I think this

15   is very interesting and informative to me.  Go back to

16   the middle category.  As I am now seeing it, have you a

17   version of the middle category that the Chief Justice

18   was asking.  And -- and call it Congress sometimes

19   passes a statute that creates a pariah.  It could be a

20   substance, it could be a form of behavior, it could be a

21   structure of an industry.

22            And then once it does that, it makes that

23   unlawful.  And now what it's done, it is more unusual

24   than I ever thought.  It comes up in the loyalty

25   context, fiduciary, but we are not talking about

Official - Subject to Final Review

36

1    fiduciary.  It says it is a harm and you will earn money

2    if you deal with a pariah, assuming it wasn't your

3    fault.

4             Now, that's -- that's where I have ended up

5    with your answers to the Chief, and now, having put it

6    that way, I can find loads of examples in my mind where

7    there is a trustee or fiduciary involved.  I can think

8    of an example in the qui tam context, but to think of

9    one right on point is a little hard, though I thought

10   there must be some.

11            MR. LAMKEN:  Justice Breyer, the breach of

12   contract, in some sense, is precisely that pariah.

13            JUSTICE BREYER:  The what?

14            MR. LAMKEN:  A breach of contract.  If

15   somebody breaches -- a contractual duty owed to me, I

16   don't have to prove that I suffered economic injury.

17   The breach of the promise itself gives me a grievance

18   sufficient to entitle me to sue for nominal damages

19   and --

20            JUSTICE BREYER:  You mean you can sue in

21   court even if what you come in and you say, they

22   breached my contract, and as a result, I made $10,000 I

23   wouldn't have otherwise made?  And when the judge says

24   "And what damages do you seek," you say?

25            MR. LAMKEN:  I would like $1 more, Your

Official - Subject to Final Review

1    Honor.  I want nominal damages or --

2                    JUSTICE BREYER:  And you can do that?

3                    MR. LAMKEN:  Or -- or -- so, if there are

4    stipulated liquidated damages, you are entitled to those

5    as well.  That is the common law rule for years --

6                    JUSTICE BREYER:  No liquidated --

7                    MR. LAMKEN -- and that is the majority rule

8    today.

9                    JUSTICE BREYER:  Okay.

10                   MR. LAMKEN:  So that is -- that is precisely

11   the context.  But if I --

12                   JUSTICE SOTOMAYOR:  Counsel --

13                   CHIEF JUSTICE ROBERTS:  So you would accept

14   $1 in this case?

15                   MR. LAMKEN:  Well, Your Honor, we are in --

16   I think that that is --

17                   (Laughter.)

18                   MR. LAMKEN:  We are hoping to do better,

19   Your Honor.  But that actually illustrates --

20                   CHIEF JUSTICE ROBERTS:  Well, no, that --

21   that gets -- I didn't mean to be facetious, but it gets

22   to the question of whether or not you have to actually

23   show injury-in-fact.  Your allegation in this case is

24   for damages, not just nominal damages but damages.

25                   MR. LAMKEN:  Your Honor, if the injury is

Official - Subject to Final Review

38

1    sufficient to get you in court to get $1 --

2                   JUSTICE GINSBURG:  Is that --

3                   MR. LAMKEN:  -- it doesn't evaporate just

4    because you want to get --

5                   JUSTICE GINSBURG:  Mr. Lamken, you are not

6    seeking damages.  You are seeking what the statute says

7    you can get which is your money back treble?

8                   MR. LAMKEN:  Exactly, Your Honor.  We are

9    seeking precisely what the statute and title does when

10   there is the breach of this duty owed to us --

11                  JUSTICE GINSBURG:  So it's not that you have

12   to prove --

13                  MR. LAMKEN:  -- for our protection.

14                  JUSTICE GINSBURG:  -- any other damages

15   because the statute has specified what the recovery is.

16                  MR. LAMKEN:  Exactly right.

17                  CHIEF JUSTICE ROBERTS:  Do you want -- I'm

18   sorry.

19                  MR. LAMKEN:  One injury not to, one

20   injury-in-fact, a violation of a duty owed to us for our

21   protection, not an additional injury in the form of

22   having suffered an economic loss.

23                  CHIEF JUSTICE ROBERTS:  Do you want to get

24   out of this contract?

25                  MR. LAMKEN:  Pardon?

Official - Subject to Final Review

1          CHIEF JUSTICE ROBERTS:  Do you want to get

2     out of this deal?

3          MR. LAMKEN:  Your Honor, I don't know

4     whether or not Ms. Edwards would want to get out of the

5     deal or not.  But the statute says that she doesn't have

6     to give up her insurance which protects her home in

7     order to obtain the benefits of -- that Congress

8     guaranteed her which were --

9          CHIEF JUSTICE ROBERTS:  I didn't see -- I

10    didn't see an allegation for a decision or -- or -- so

11    you are perfectly happy as far as we know from the

12    complaint with this deal, you just want the extra $500

13    per class member without showing any injury --

14          MR. LAMKEN:  I think this -- I think this

15    brings me back to the question you were asking me

16    before, which is indeed, we think it's like that there

17    is -- that there are diminution in quality and paying

18    excessive price, but the law says we don't have to prove

19    that because the law's elevated our right to a

20    conflict-free transaction to legally protect its status.

21          The very reason the common law said in the

22    fiduciary and the trust and all the other confidential

23    issues in context said we are not going to ask about the

24    economics, we are not going to regulate the economics

25    here, because that's too hard.  What we are going to do

Official - Subject to Final Review

40

1    is we are going to protect your right to receive the

2    best advice possible.  And at that --

3              JUSTICE SOTOMAYOR:  Counsel, maybe I'm just

4    looking at this too simply.  You pay -- your client paid

5    $455 for title insurance, correct?

6              MR. LAMKEN:  Yes.

7              JUSTICE SOTOMAYOR:  She is claiming that she

8    paid that money on the statutory assumption that the

9    agent would disclose to her any kickbacks, correct?

10             MR. LAMKEN:  It's not a disclosure duty but

11   on the statutory basis that she was entitled to a

12   conflict-free referral.  That they were not directing

13   her purchase on the basis of complex·that is so --

14             JUSTICE SOTOMAYOR:  She said I didn't

15   receive what I paid for, correct?

16             MR. LAMKEN:  Exactly, Your Honor.

17             JUSTICE SOTOMAYOR:  I paid money, I lost the

18   money, I have it back because what I've bought was a

19   conflict-free --

20             MR. LAMKEN:  That's exactly right.

21             JUSTICE SOTOMAYOR:  -- referral, and that's

22   not what I got?

23             MR. LAMKEN:  Like an aggrieved trust

24   beneficiary, she is seeking to get back something that

25   belonged to her, $455 that she parted company with in a

Official - Subject to Final Review

41

1    conflicted transaction.

2            CHIEF JUSTICE ROBERTS:  You -- you don't

3    want the conflict-free transaction because you don't

4    want to get out of this contract.  You are perfectly

5    happy with the contract.  You want $500.  You don't want

6    a conflict-free transaction because even if it was a --

7    were a conflict-free transaction, the price would be the

8    same, in Ohio.

9            MR. LAMKEN:  Not necessarily so, Your Honor,

10   because Ohio does not preclude price competition.  You

11   can file for --

12           CHIEF JUSTICE ROBERTS:  Okay.  Now there the

13   answer to my question, and I don't mean to focus on a

14   peculiar structure but your answer was on part 1.  You

15   said no, not necessarily.  Here there was an

16   injury-in-fact, she might have gotten a better deal.

17           MR. LAMKEN:  She has been exposed -- it's

18   impossible to tell whether or not Fidelity would have

19   been better because of financial settlements or another

20   company would have been better because it has better

21   clean paneling down the road.

22           JUSTICE SCALIA:  And you don't want to have

23   to prove that, because if you proved any damage, there

24   goes your class action --

25           MR. LAMKEN:  Absolutely not.

42

1          JUSTICE SCALIA:   -- because you don't have

2    commonality.

3          MR. LAMKEN:   The reason we're not -- we did

4    not allege it is because the statute doesn't require it

5    and for 280 years when somebody takes a -- takes a

6    kickback that interferes with your obtaining the best

7    deal possible, that itself was actionable without

8    proving any further --

9          JUSTICE SCALIA:   How does it -- how does it

10   harm her to get a title insurance policy for the price

11   of $453 from what you call a kickback-free seller, as

12   opposed to getting the same title insurance for $453

13   from a non-kickback-free seller?   Is·that an

14   injury-in-fact?

15         MR. LAMKEN:   Yes.

16         JUSTICE SCALIA:   The -- the -- the vague

17   notion of -- of buying it from -- from -- I don't know,

18   a white knight?   Is -- is that the kind of

19   injury-in-fact that our cases talk about?

20         MR. LAMKEN:   Your Honor --

21         JUSTICE SCALIA:   It seems to me purely -- I

22   don't know, philosophical.

23         MR. LAMKEN:   It's not philosophical at all

24   because that exact right, ensuring that she gets her --

25   her purchase in a kickback-free transaction is for her

Official - Subject to Final Review

43

1    benefit. And when she is denied that right, she has

2    been denied something of potential value that hasn't

3    been denied to everybody else in the universe.

4            For her protection, she was entitled to have

5    them -- the very fact of the kickback undermines the

6    incentive to pursue her best interest. Like a trust

7    beneficiary, a home buyer spending her money to insure

8    title on her home as a concrete and particularized

9    interest in insuring that those who direct the purchase

10   are not doing it based on kickbacks, which is so

11   undermining -- incentive to seek her best interest.

12           It may be very hard to prove in individual

13   cases that, you know, fidelity is more financially sound

14   or another has better claims handling. But it was

15   precisely for that reason that Congress got out of the

16   business and courts got out of the business of trying to

17   regulate the underlying economics. They are not going

18   to regulate price. They are not going to regulate

19   quality. And instead, we are going to give you a right

20   to get the referral from somebody who has expertise and

21   who doesn't have a conflict created by a conflict -- by

22   a kickback that so undermines their incentive --

23           JUSTICE SCALIA: That is Congress wanted to

24   get out of the business. But the issue here is whether

25   Congress can get out of the business, whether it is the

44

1    function of courts to provide relief to people who

2    haven't been injured.  I mean, that's -- that's --

3    that's the whole issue.

4              MR. LAMKEN:  Justice Scalia, the

5    Constitution, statutes, the common law regularly create

6    bright line across the board rights to protect

7    underlying financial or other economic interests.  Where

8    the right may sweep more broadly or may apply in cases

9    where those underlying inputs are defected.  But we

10   don't go look backwards at the purpose of the right,

11   abstract the right to its purpose and say, well, unless

12   it's purpose was -- was achieved in this particular

13   purpose, we're not going to --

14             JUSTICE ALITO:  Would there be

15   injury-in-fact if the plaintiff knew everything that was

16   relevant to this had -- had -- was an economist who had

17   studied the effect of these things on title insurance

18   price and quality, and in fact, had -- was aware of

19   every single transaction that had ever occurred between

20   the title insurance company and the title agent?  Would

21   there be injury, in fact, in that situation?

22             MR. LAMKEN:  Yes.

23             JUSTICE ALITO:  And nevertheless said, okay,

24   I understand this is what I'm getting into, but I'm

25   going ahead.

Official - Subject to Final Review

1          MR. LAMKEN:  Yes.  There's -- there's

2     injury --

3          JUSTICE ALITO:  There would be injury, in

4     fact"?

5          MR. LAMKEN:  Yes, because he has been denied

6     something he is entitled to, which is another expert's

7     untainted referral, which is not affected by any way by

8     kickbacks, which we know is entirely corrosive in

9     interest to pursue his best interest.  You might --

10          JUSTICE KENNEDY:  But -- but it's circular

11     for you to say he was denied something that he is

12     entitled to.  The question is whether there is an

13     injury.  The Constitution requires an injury.

14          MR. LAMKEN:  Right.

15          JUSTICE KENNEDY:  If you were to say he was

16     entitled to it and therefore, there is an injury, that's

17     just -- that's just circular.  That gives no substance

18     at all to the -- to the meaning of the term "injury."

19          MR. LAMKEN:  Yes, but the -- the invasion of

20     a statutory right itself can be injury in fact so long

21     as it is sufficiently concrete and -- and

22     particularized.  That you are not just asserting

23     another -- an interest of the public at large.

24          The Court has protected interests as

25     divorced from property interest, as the right to obtain

Alderson Reporting Company

Official - Subject to Final Review

1   information from the government through FOIA or FACA,

2   and it can protect your -- your non-property interest in

3   not being defamed.  All of these things are protected.

4   Your rights to performance under contract.  All of the

5   these things are protected whether or not there is

6   further economic harm that results.

7          And the no further inquiry world that is

8   applied in the trust and fiduciary contracts sphere is

9   just another example where the law elevates your

10  interest in not having conflict --

11         CHIEF JUSTICE ROBERTS:  Can I ask you, just

12  to follow up.  You said whether or not there is further

13  economic harm.  So you say economic harm is required --

14         MR. LAMKEN:  No, I --

15         CHIEF JUSTICE ROBERTS:  -- because there

16  can't be further economic harm if there isn't economic

17  harm in the first place.

18         MR. LAMKEN:  Further, comma, economic harm.

19  Further harm of the economic sort, Your Honor.

20         CHIEF JUSTICE ROBERTS:  Further harm that

21  happens to be economic, not further economic harm.

22         MR. LAMKEN:  Exactly.  But I view it to be

23  further harm, much less further economic harm.

24         Thank you, Your Honor.

25         CHIEF JUSTICE ROBERTS:  Thank you,

Official - Subject to Final Review

1     Mr. Lamken.

2             Mr. Yang?

3             ORAL ARGUMENT OF ANTHONY A. YANG,

4        ON BEHALF OF THE UNITED STATES, AS AMICUS CURIE,

5             SUPPORTING THE RESPONDENT

6             MR. YANG:  Mr. Chief Justice, and may it

7     please the Court:

8             When an individual has a statutory right to

9     a kickback-free referral in a financial transaction, she

10    participates in a particular financial transaction in

11    which her right is violated and she pays money for the

12    service unlawfully referred, she has sustained an

13    Article III injury in fact based on, ·as this Court in

14    its repeatedly explained test, an invasion of a legally

15    protected interest.  That is --

16            JUSTICE SCALIA:  Suppose -- Mr. Yang, let

17    me -- me give -- give you a hypothetical.  Suppose

18    Congress did this to spare the Attorney General the

19    necessity of suing to enforce these requirements.

20    Suppose Congress wants to take the burden off the back

21    of the Internal Revenue Service.

22            So it says that anybody who buys any product

23    from a company that has not paid its taxes is entitled

24    to $500, okay?  What that person is entitled to is a --

25    a tax-observant seller -- given a national right to a

48

1  tax-observant seller.  Would every person who buys from

2  some -- some company that hasn't paid its taxes have a

3  cause of action?

4          MR. YANG:  No.

5          JUSTICE SCALIA:  Why not?

6          MR. YANG:  This Court has explained, I think

7  principally in your opinion in Lujan v. Defenders of

8  Wildlife, that Congress cannot convert an

9  undifferentiated public interest in enforcement of the

10  law --

11          JUSTICE SCALIA:  But this is differentiated.

12  You have to have bought from one of these companies.

13  It's not everybody.  Not everybody has bought from these

14  tax cheats.

15          MR. YANG:  I understand.

16          JUSTICE SCALIA:  It's only the people who

17  bought from tax cheats.

18          MR. YANG:  There is also a threshold.

19  Obviously, Congress can't simply narrow the class of --

20  of plaintiffs to say people with college degrees, or

21  people who were born on a Monday.  There needs to be a

22  sufficient connection between the --

23          JUSTICE SCALIA:  A nexus, right?  Your brief

24  is full of nexus.

25          MR. YANG:  Would you -- would you --

Official - Subject to Final Review

1          JUSTICE SCALIA:   Legal jargon for

2     "connection."

3          MR. YANG:   We'll use "connection" here.

4          JUSTICE SCALIA:   Lovely.   Say connection, I

5     might add.   I love it.

6          (Laughter.)

7          MR. YANG:   We'll say "connection."

8          But what -- in our view, there needs to be a

9     reasonable connection between the proscribed conduct:

10    here, the paying of taxes, and the class of persons --

11         JUSTICE SCALIA:   Okay.

12         MR. YANG:   -- to which the Congress has

13    conferred the right, and that has to·be such that the

14    first class is reasonably regarded as victims of the

15    conduct.

16         JUSTICE SCALIA:   How much of a connection

17    is -- is necessary?   Suppose you -- you have a law that

18    requires all machine parts produced by companies to --

19    to contain a certain feature, and anyone who buys one

20    that doesn't contain that feature gets $500.   I purchase

21    one.   That feature is of no use to me at all.   That

22    product would·be just as good for me for the purposes

23    for which I am using it had it not had that feature.

24         Would that be okay?   Would I have a cause of

25    action?

Official - Subject to Final Review

50

1          MR. YANG:  It's unclear.  Let me -- let me

2     try to figure out the hypothetical a little bit further.

3     If Congress -- for instance, if the machine part was a

4     safety harness in your car and you purchased a car with

5     a safety harness but you happen simply, you know, to not

6     use the safety harness, Congress might well be able to,

7     say -- provide for a protection for all purchasers of

8     this particular vehicle or any kind of vehicle, must --

9     those types of vehicles must have that safety equipment

10    in order to protect the consumers who purchase it.

11          And in that instance, Congress could well

12    provide for a statutory damage provision to protect such

13    an individual generally.

14          JUSTICE SCALIA:  So even though I've

15    installed my own safety harness, which I always do when

16    I buy a car, I can sue because this car that they sold

17    me didn't have the safety harness.  500 bucks.

18          MR. YANG:  That's correct.  And let me --

19    let me throw out some historical analogues to explain

20    why the focus has to be on the invasion of the legally

21    protected interest.  You have things like trespass.  At

22    common law -- and this was well known to the framers --

23    at common law, if you simply step across a boundary

24    line, a line defined in law and the rights that are

25    defined in law that are associated with that line, if

Official - Subject to Final Review

51

1    you simply step across this and step back, that is a

2    trespass.

3              You can bring an action in court, and you

4    could have no -- no impact whatsoever except the

5    invasion of your legal right, and you would get nominal

6    damages.  And that type -- similarly, if you have a

7    contract, you could have a breach of the contract.

8              JUSTICE BREYER:  But Justice Scalia has a

9    point.  I mean, as I heard it, he was reiterating what

10   used to be called a prudential rule of standing.  It

11   wasn't constitutional, but you looked to see if the

12   statute is meant to protect this kind of person against

13   that kind of harm, all right?

14             And if not, there is lack of prudential

15   standing.  Well, if that's the test, his case would fall

16   outside it, because the tax law is not meant to protect

17   the plaintiff there, but this case would fall within it.

18             MR. YANG:  I think it's more than prudential

19   standing.  It goes to what is an injury in fact, which

20   the Court has again repeatedly explained is an invasion

21   of a legally protected interest that is sufficiently

22   concrete and particularized.

23             No, we don't think that Congress can,

24   through the guise of a right, convert a generalized

25   interest in enforcement of the law into something that

Official - Subject to Final Review

52

1     an individual can come into --

2               CHIEF JUSTICE ROBERTS:  Why do --

3               JUSTICE SCALIA:  What is the specific -- I'm

4     sorry, Chief, go ahead.

5               CHIEF JUSTICE ROBERTS:  What -- why do we

6     always say injury in fact then?  You say so long as the

7     harm is a violation of the law in legally protected

8     interest.  Our standing cases always say injury in fact

9     as opposed to injury in law.  And you are saying if you

10    violate the law, you have sufficient injury.

11              MR. YANG:  Well, your cases actually say an

12    injury in fact.  And then you go on to explain.  For

13    instance, in Defenders of Wildlife, that that is

14    invasion of a legally protected interest.  I'm not

15    saying it's any invasion of a law, but when Congress

16    confers a right --

17              CHIEF JUSTICE ROBERTS:  Because -- they also

18    go on to say that it has to be concrete.

19              MR. YANG:  Right.

20              CHIEF JUSTICE ROBERTS:  Real and immediate,

21    not conjectural or hypothetical.

22              MR. YANG:  That's right.  It can't be an

23    abstract type of a thing; it has to be in a specific

24    factual context that is amenable to judicial -- a

25    realistic judicial appreciation of the consequences --

Official - Subject to Final Review

53

1          CHIEF JUSTICE ROBERTS:  So that all of our

2     cases, we could have left "in fact" out of all of them.

3     None of them come out differently because we insist on

4     injury in fact.

5          MR. YANG:  Well, I -- I don't know if you

6     could have left it out.  You could have called it

7     anything.  It is a legal label that the Court has

8     applied to --

9          CHIEF JUSTICE ROBERTS:  The difference

10    between legal harm, though -- isn't that -- I guess I'm

11    just repeating myself.  Injury in fact.  How do you

12    understand that to be different than any other kind of

13    injury?

14         MR. YANG:  Well, an injury in fact is not

15    simply a legal injury in the sense of any violation of

16    the law, it is an invasion of a legally protected

17    interest with respect to this particular individual, the

18    particular plaintiff.

19         CHIEF JUSTICE ROBERTS:  The two elements,

20    that's the particularized requirement, and I understand

21    that.  But you are saying there's -- injury in fact

22    simply means particularized.

23         MR. YANG:  No, no, no, no.  It includes

24    several concepts.  An injury in fact is an invasion of a

25    legally protected interest.  It either has to be actual

54

1   or imminent, and it has to be concrete and

2   particularized.  Now, again, so there's several concepts

3   within the umbrella of injury in fact.

4           But I'd like to go back to the examples that

5   we would find at the time of the framing, of many types

6   of injuries, where you don't have to have anything other

7   than an invasion of your legally protected right.  For

8   instance, a right to an agreement.  If there is a breach

9   that has no impact whatsoever, you would be able to get

10  in and sue.

11          Now, there is a question of the

12  quantification of damage, but that's separate.  That's

13  not whether you have an injury in fact, it is how --

14  it's the measure of damages, and the measure of damages

15  in common law would be nominal damages.

16          Similarly, an invasion -- a trespass

17  invasion, or, for instance, if you were a beneficiary of

18  a --

19          JUSTICE KENNEDY:  I'm not sure about

20  trespass.  The object of my owning property is that I

21  have a right to exclude.  This is what I own.  This is

22  what the law protects.  This is a spatial area for --

23  for my -- which is my own domain.

24          MR. YANG:  And why you have that is --

25          JUSTICE KENNEDY:  And there -- there is an

1    injury to that right.  Now --

2              MR. YANG:  But if the right's threatened --

3              JUSTICE KENNEDY:  -- you want to say that

4    Congress can say that you have a right to buy a

5    conflict-free title insurance policy.  I'm -- I'm not

6    sure that the two equate.

7              MR. YANG:  Well, going back to your

8    hypothetical, the reason you have that interest, the

9    reason you have the right to exclude this space is

10   solely by operation of the law.  Those concepts, they

11   are attached to property rights, were created by common

12   law courts.  Just as common law courts can create

13   rights, the invasion of which create interest, so too

14   can a State legislature or when Congress is acting

15   within its Article III power to the one power --

16             JUSTICE KENNEDY:  Well, but it's essential

17   to my -- it's essential to my feeling of security and

18   dignity and privacy.  Like Justice Breyer's telephone

19   hypothetical.

20             MR. YANG:  I don't -- I don't think the --

21   any common law court has inquired whether the invasion

22   of -- the trespass somehow made you insecure --

23             CHIEF JUSTICE ROBERTS:  Trespass cases, it

24   seems to me, are different because you are talking about

25   a property right, and you can sell a property right.

1    You can go to somebody and say I have the right to keep

2    people off of this piece of property.  Do you want to

3    buy it?  Here's how much it's worth.  But if -- that's

4    only a property right to the extent you can keep people

5    off of it.

6              Here no one is going to buy this right from

7    the -- the -- the plaintiff, because everybody's got it

8    anyway.  You don't -- you don't pay her, because she

9    doesn't have a tangible concrete right.  The trespass

10   case, the person obviously does, because he can sell it.

11             MR. YANG:  Well, anything can be monetized.

12             CHIEF JUSTICE ROBERTS:  No, this one --

13   that's my point.  This cannot be monetized because

14   everybody's already got it.

15             You can answer.

16             MR. YANG:  Well --

17             CHIEF JUSTICE ROBERTS:  It's not really a

18   question, but you can answer.

19             (Laughter.)

20             MR. YANG:  Well, it is -- it's kind of a

21   statement, although you know in this -- this is specific

22   transaction, this is a transaction involving the

23   plaintiff.  She paid money for a service that she got,

24   and it was unlawfully tainted by a kickback and that's

25   the type of thing that traditionally can be enforced in

Official - Subject to Final Review

1   court.

2          CHIEF JUSTICE ROBERTS:   Thank you, Mr. Yang.

3          Mr. Panner, you have 4 minutes remaining.

4          REBUTTAL ARGUMENT OF AARON M. PANNER

5          ON BEHALF OF THE PETITIONERS

6          MR. PANNER:   Thank you, Mr. Chief Justice.

7   It seems to me that there are two positions that have

8   been articulated before the Court and both are

9   inconsistent with the Court's prior decisions.   The

10  first is --

11         JUSTICE SCALIA:   Not yours and his?

12         (Laughter.)

13         MR. PANNER:   That of the --- that of the

14  plaintiff and that of the government, Your Honor.   I

15  should have been more particularized.

16         (Laughter.)

17         MR. PANNER:   The violation of a duty owed to

18  us, that is what plaintiff claims is the injury here.

19  The violation of a duty is a violation of a duty; it is

20  not injury.   And similarly the government says that what

21  is required is a sufficient connection to the conduct,

22  but what is required is not a connection to the conduct,

23  what is required is an injury-in-fact, a harm to the

24  plaintiff who is seeking to obtain redress from the

25  courts.   And that fundamental limitation on the role of

Official - Subject to Final Review

1   the courts is critical to the liberty of the people who

2   come before the courts and who are subject to the power

3   of the courts.

4            It is absolutely appropriate for someone who

5   has been harmed through the violation of a statutory or

6   common law duty owed to that person to come before the

7   court seeking redress, but what is not possible is for

8   the courts to be open to a plaintiff who has not alleged

9   that the statutory duty -- the statutory violation that

10  has been alleged has caused any adverse impact.

11           Now of course there are broadly -- there

12  are -- there is illegal conduct that may have caused

13  harm to a broad section of the population.  If somebody

14  engages in price fixing and then sells those price fixed

15  goods it may be easy to show that as a result of that

16  many people suffered harm and can come into court to sue

17  for it.  Similarly, there are non-financial harms that

18  are the basis for standing in many, many cases:  for

19  example, defamation, harm to reputation, discrimination

20  where somebody is subject to a -- an injury of being

21  discriminated against.

22           JUSTICE SCALIA:  What about a -- I'm sorry

23  to interrupt your -- your concluding marks, but I am

24  troubled by the dollar nominal damages for breach of

25  contract.  What do you say about that?

Alderson Reporting Company

Official - Subject to Final Review

1          MR. PANNER:  Well, Your Honor, in -- in a

2    circumstance in which there is a bargain for

3    performance, and it may well be that there is a

4    recognition that there is value that was assigned to

5    that performance that may be hard to measure, and

6    therefore there is a concrete injury that is hard to

7    measure, and the therefore nominal damages is awarded.

8          Now the cases are not uniform on whether

9    nominal damages are available.  There is a -- it's

10   actually split and that there's -- we are not aware of a

11   case in this Court that would say that in a circumstance

12   in which there was a harmless breach, that -- that a

13   suit for nominal damages would establish Article III

14   standing, so with respect to that I'm -- I'm not sure

15   what the answers would be.

16          Unless the Court has further questions?

17          CHIEF JUSTICE ROBERTS:  Thank you, counsel,

18   counsel.

19          The case is submitted.

20          (Whereupon, at 11:02 a.m., the case in the

21   above-entitled matter was submitted.)

22

23

24

25

Alderson Reporting Company

| A | | | | |
|---|---|---|---|---|
| **AARON** 1:18 | 18:13,13,14,16 | 3:5 | **Article** 3:11 | 35:15 38:7 |
| 2:3,13 3:7 57:4 | 19:12 23:4 | amicus 1:24 2:10 | 12:21 16:24 | 39:15 40:18,24 |
| ability 8:22 | 26:10,13 29:16 | 47:4 | 18:24 32:24 | 47:20 51:1 54:4 |
| able 50:6 54:9 | 29:16,25 30:1 | amount 7:23 | 47:13 55:15 | 55:7 |
| above-entitled | 30:12 40:9 | analogues 50:19 | 59:13 | backwards 44:10 |
| 1:14 59:21 | 44:20 | analyses 22:15 | articulated 17:5 | bad 7:1,1 |
| absence 20:3 | agents 26:4 30:7 | answer 21:8 | 57:8 | bans 4:18 |
| absolutely 12:8 | 30:11 | 29:17 32:13 | aside 27:25 | bargain 59:2 |
| 28:23 29:18,20 | agent's 15:25 | 41:13,14 56:15 | asking 35:18 | bargained 18:6 |
| 41:25 58:4 | aggrieved 40:23 | 56:18 | 39:15 | based 3:21 43:10 |
| abstract 25:23 | agree 34:22 | answers 36:5 | asserting 45:22 | 47:13 |
| 44:11 52:23 | agreement 17:14 | 59:15 | assigned 59:4 | basis 12:11,16 |
| abstracted 12:9 | 54:8 | antecedent | **Assistant** 1:22 | 16:6,16 25:19 |
| accept 37:13 | ahead 13:20 | 19:10 | associated 50:25 | 40:11,13 58:18 |
| accepting 28:11 | 44:25 52:4 | **ANTHONY** 1:22 | assume 10:21,23 | bears 15:23 |
| achieve 28:20,21 | **AL** 1:6 | 2:9 47:3 | 29:16 | behalf 1:19,21 |
| achieved 44:12 | **ALITO** 13:11,19 | antitrust 9:15,24 | assuming 13:24 | 2:4,7,14 3:8 |
| Act 9:3,5 | 14:2,7 24:22 | anybody 4:20 | 13:25 24:9 36:2 | 25:13 47:4 57:5 |
| acting 5:25 29:12 | 27:2,24 44:14 | 47:22 | assumption 40:8 | behaved 10:10 |
| 29:16 55:14 | 44:23 45:3 | anyway 56:8 | assurance 17:15 | behavior 35:20 |
| action 12:11,16 | Alito's 29:5 | apart 20:5 | attached 18:6 | believe 6:24 34:9 |
| 41:24 48:3 | allegation 6:22 | **APPEARANC...** | 55:11 | believed 15:18 |
| 49:25 51:3 | 9:22 15:20 | 1:17 | attempting 21:13 | believes 11:17 |
| actionable 42:7 | 22:19,21 24:13 | appears 7:6 | 21:14,14 | belonged 11:5 |
| acts 10:22 | 37:23 39:10 | appended 22:10 | **Attorney** 47:18 | 40:25 |
| actual 4:9 53:25 | allegations 24:11 | applied 46:8 53:8 | attorneys 28:19 | beneficiary 10:7 |
| add 49:5 | 32:22 | applies 30:7 | attributes 27:6 | 10:24 11:1,3,5 |
| addition 15:5 | allege 7:17 8:14 | apply 44:8 | auto 27:9 29:7,24 | 11:6,13 21:3 |
| 23:21 | 11:21 12:3 | appreciation | automatic 4:19 | 40:24 43:7 |
| additional 38:21 | 13:13 14:3 15:7 | 52:25 | 10:13,15 | 54:17 |
| adequate 5:24 | 15:10,12 42:4 | appropriate 58:4 | automatically | benefit 3:19 6:8 |
| 22:16 | alleged 3:13,16 | area 54:22 | 3:14 4:1 | 6:13,15,16 |
| advance 17:17 | 3:16 14:10 | arguably 15:6,8 | automobile 29:5 | 10:10 11:8 43:1 |
| 23:10 | 19:13 21:13 | arguing 7:9 8:7 | available 5:14 | benefits 39:7 |
| adverse 22:13 | 22:23 24:1,8,9 | 31:9 | 8:2,4 59:9 | best 4:5 16:5 |
| 58:10 | 24:18,23 58:8 | argument 1:15 | awarded 59:7 | 26:24,25,25 |
| advice 28:9 33:4 | 58:10 | 2:2,5,8,12 3:4,7 | aware 44:18 | 30:9,17 40:2 |
| 40:2 | allegedly 28:2 | 25:12 27:3 31:4 | 59:10 | 42:6 43:6,11 |
| affidavit 22:11 | alleges 8:3 23:22 | 31:10 32:7 | a.m 1:16 3:2 | 45:9 |
| afford 28:16 | 24:3 | 33:25 35:7 47:3 | 59:20 | better 11:14 35:1 |
| agency 29:6,10 | alleging 9:13 | 57:4 | | 37:18 41:16,19 |
| 29:15 30:3,14 | allow 18:10 | arguments 31:2 | B | 41:20,20 43:14 |
| agent 14:14 | allowed 27:21 | arms 30:25 | back 5:18 6:4 | biggest 16:6 |
| 15:19,21,24 | amenable 52:24 | arrangements | 12:14 13:3 | bill 6:2 |
| | **American** 1:3,5 | 22:13 | 20:19 32:7,10 | bit 50:2 |

Official - Subject to Final Review

61

| | | | | |
|---|---|---|---|---|
| board 30:8,12 | 48:1 49:19 | cent 29:21,22 | City 16:1 | 49:18 |
| 35:1 44:6 | _____ | certain 6:24 | claim 11:11 | company 11:23 |
| born 48:21 | C | 27:12 49:19 | 12:10 13:9 | 15:3 16:14,21 |
| bothered 12:6 | C 2:1 3:1 | certainly 9:8 | 24:16 | 18:15,19 26:5 |
| bought 4:20 | call 3:25 4:2,3,5 | 12:7 13:1,15 | claiming 40:7 | 26:11 29:9 |
| 40:18 48:12,13 | 12:6 26:3,7 | 20:3,16,23 | claims 43:14 | 40:25 41:20 |
| 48:17 | 27:10,11 35:18 | 22:19 25:3 | 57:18 | 44:20 47:23 |
| boundary 50:23 | 42:11 | 28:17 34:23 | clarify 13:11 | 48:2 |
| breach 27:18 | called 31:19 | change 19:25 | 20:17 | compensated |
| 28:1 36:11,14 | 51:10 53:6 | changes 19:23 | class 12:11 39:13 | 6:14 |
| 36:17 38:10 | calls 4:4 | charge 15:4 | 41:24 48:19 | compensation |
| 51:7 54:8 58:24 | car 27:8 29:17,24 | cheaper 8:4,12 | 49:10,14 | 6:16 |
| 59:12 | 50:4,4,16,16 | 8:12 | clause 17:9 | competition |
| breached 36:22 | case 3:4,21 4:10 | cheats 48:14,17 | clean 41:21 | 41:10 |
| breaches 19:6 | 4:25,25 5:6,12 | Chief 3:3,9 5:19 | clear 5:13 12:22 | competitive |
| 25:17 36:15 | 6:21 9:16 10:5 | 24:21 25:9,14 | 25:6,17 28:23 | 23:19 |
| Breyer 3:20 4:17 | 10:6,7 11:6 | 30:24 31:13,16 | 29:20 | complain 5:15 |
| 4:24 5:7 16:2 | 12:11 13:6 | 32:2,6,18,21 | clearing 15:16 | complaining 4:4 |
| 35:14 36:11,13 | 14:25 15:18 | 33:7,11,18,24 | client 33:14 40:4 | complaint 5:13 |
| 36:20 37:2,6,9 | 17:20 18:11,13 | 34:12,18,22 | closest 9:16 | 8:14 12:9 13:9 |
| 51:8 | 19:8 20:14 | 35:5,9,17 36:5 | 30:13 | 21:22 22:11,21 |
| Breyer's 12:5 | 21:13,15 23:3 | 37:13,20 38:17 | closing 13:17 | 39:12 |
| 55:18 | 24:12 26:18 | 38:23 39:1,9 | collateral 23:21 | complex 40:13 |
| brief 48:23 | 29:19,19 30:13 | 41:2,12 46:11 | college 48:20 | component 26:21 |
| briefs 31:4 | 31:3 32:22 | 46:15,20,25 | combinations 9:3 | 30:6 |
| bright 44:6 | 33:12,14,19 | 47:6 52:2,4,5 | come 4:12 7:11 | conceivable |
| bring 6:25,25 | 37:14,23 51:15 | 52:17,20 53:1,9 | 8:9,23 10:8 | 15:14 |
| 21:14,15 51:3 | 51:17 56:10 | 53:19 55:23 | 28:5 36:21 52:1 | concepts 53:24 |
| brings 39:15 | 59:11,19,20 | 56:12,17 57:2,6 | 53:3 58:2,6,16 | 54:2 55:10 |
| broad 7:5 8:19 | cases 3:17 6:3,7 | 59:17 | comes 4:16 17:1 | concerned 5:23 |
| 25:5 58:13 | 6:7,10,12 7:10 | choose 22:8 | 27:5 35:24 | concludes 23:17 |
| broader 23:7,8 | 8:8 9:3,9,11,18 | 26:24 | comma 46:18 | concluding 58:23 |
| broadly 8:7 23:2 | 9:22 10:2,11 | chosen 16:15,15 | commission 26:4 | concrete 19:10 |
| 44:8 58:11 | 11:5 20:1 21:11 | 16:21 | 26:5,9 | 19:12,18 20:5 |
| broken 29:17 | 22:3,5 31:7,20 | circular 45:10,17 | common 3:17 | 22:21 25:22 |
| broker 18:16 | 42:19 43:13 | circumstance | 20:1,6 28:22 | 43:8 45:21 |
| bucks 50:17 | 44:8 52:8,11 | 6:16,23 9:19 | 35:10 37:5 | 51:22 52:18 |
| burden 47:20 | 53:2 55:23 | 10:3 11:3,9 | 39:21 44:5 | 54:1 56:9 59:6 |
| business 30:1,21 | 58:18 59:8 | 18:9 33:19 59:2 | 50:22,23 54:15 | conduct 3:13 |
| 43:16,16,24,25 | category 6:11 | 59:11 | 55:11,12,21 | 49:9,15 57:21 |
| buy 50:16 55:4 | 35:16,17 | circumstances | 58:6 | 57:22 58:12 |
| 56:3,6 | cause 6:1 12:15 | 6:8,13 7:16 | commonality | confer 12:19 |
| buyer 14:20 43:7 | 48:3 49:24 | 20:18 25:4 | 42:2 | conferred 6:13 |
| buying 42:17 | caused 19:2 | cite 9:12 | companies 14:17 | 49:13 |
| buys 16:8 47:22 | 23:11 58:10,12 | cited 9:18 19:9 | 15:4 16:5 48:12 | confers 52:16 |

Alderson Reporting Company

Official - Subject to Final Review

confidential
28:12 39:22
conflict 25:19
26:22 32:5 34:6
43:21,21 46:10
conflicted 41:1
conflicts 26:15
29:2 34:11
conflict-free
25:22 28:9,24
31:11 32:3 34:5
35:11 39:20
40:12,19 41:3,6
41:7 55:5
Congress 3:22
5:9,22,25 6:24
7:9 12:15,19,22
16:2,19,23 17:2
17:3,22 18:7,12
18:20 19:19
22:7,7,8,12
23:2,6,8,10,16
26:12,20 27:6
28:8,20 30:6
31:4 32:14
34:16,19 35:7
35:18 39:7
43:15,23,25
47:18,20 48:8
48:19 49:12
50:3,6,11 51:23
52:15 55:4,14
conjectural
34:14,16 35:1
52:21
connection 24:1
48:22 49:2,3,4
49:7,9,16 57:21
57:22
consequence
29:1
consequences
34:17 52:25
consequential
21:20

consider 20:4
consists 16:13
constitute 18:23
Constitution
16:23,24 44:5
45:13
constitutional
12:25 51:11
constitutionally
12:20
constructive
6:17
consumer 30:10
consumers 50:10
contain 49:19,20
context 35:25
36:8 37:11
39:23 52:24
contexts 30:19
contract 17:8,9
17:12,22 18:3,4
19:19,21,23
20:11,25 36:12
36:14,22 38:24
41:4,5 46:4
51:7,7 58:25
contracting 21:1
contractor 30:1,5
contracts 9:3
46:8
contractual
36:15
contradistinction
31:22
conventional
11:16
convert 48:8
51:24
core 17:5
Corporation 1:4
1:5 3:5
correct 12:18
40:5,9,15 50:18
corrosive 45:8
cost 17:11 23:24

27:13 33:20
counsel 5:17 7:4
23:13 37:12
40:3 59:17,18
course 6:10 10:6
19:15 58:11
court 1:1,15 3:10
4:1,12,16 8:23
9:13 10:8 12:21
16:25 17:1,5,5
18:5,9,11 20:3
21:4 25:15
36:21 38:1
45:24 47:7,13
48:6 51:3,20
53:7 55:21 57:1
57:8 58:7,16
59:11,16
courts 17:4 43:16
44:1 55:12,12
57:25 58:1,2,3
58:8
Court's 29:19
57:9
create 12:25
17:2 18:8,21
21:10 44:5
55:12,13
created 19:18,19
20:24 43:21
55:11
creates 35:19
critical 15:13
22:22 58:1
curiae 1:24 2:10
CURIE 47:4
customer 30:4

────────
D
────────
D 3:1
damage 9:14
15:7 30:16
41:23 50:12
54:12
damages 4:1

7:10 8:18,18
36:18,24 37:1,4
37:24,24,24
38:6,14 51:6
54:14,14,15
58:24 59:7,9,13
deal 30:9 36:2
39:2,5,12 41:16
42:7
dealer 27:9
decision 32:12
39:10
decisions 57:9
decrease 21:25
decree 18:12
19:22
defamation
58:19
defamed 46:3
defames 30:20
defected 44:9
defective 14:3
defendant 6:4
Defenders 48:7
52:13
defined 50:24,25
degrees 48:20
delayed 13:17
delighted 4:13
denied 32:15
43:1,2,3 45:5
45:11
DENISE 1:9
Department 1:23
depend 18:25
19:1 25:3
depending 20:9
deprived 10:25
desired 3:18
determine 18:9
detriment 11:19
diagnosing 27:14
dictate 23:10
difference 18:2
19:20 20:9

21:19 53:9
different 17:20
18:7,11 26:17
26:18 53:12
55:24
differentiated
48:11
differently 53:3
difficulty 15:16
dignity 55:18
diminution 39:17
direct 43:9
directing 40:12
disclaimed 34:8
disclose 7:22
40:9
disclosure 40:10
discriminated
58:21
discrimination
58:19
disgorgement
10:14,16 29:11
distinction 22:6
distorted 9:14
divorced 45:25
doing 16:23 30:1
43:10
dollar 10:23
58:24
domain 54:23
doubt 16:18
Drury 29:19
duties 20:24,25
21:2 22:7
duty 3:15 10:9
20:6,6 21:10
22:24 25:17,25
26:1,9 27:5,18
28:1 29:15 30:7
36:15 38:10,20
40:10 57:17,19
57:19 58:6,9
D.C 1:11,18,20
1:23

Alderson Reporting Company

**E**

E 2:1 3:1,1
early 5:22
earn 36:1
easy 58:15
economic 19:11
  21:18 24:6,24
  25:21 28:5 29:1
  36:16 38:22
  44:7 46:6,13,13
  46:16,16,18,19
  46:21,21,23
economics 39:24
  39:24 43:17
economist 22:11
  44:16
economists
  23:17
Edwards 1:9 3:5
  3:15 17:8,10
  39:4
effect 21:20
  22:13 23:1
  24:14,17 44:17
efficient 23:23
either 30:4 53:25
elements 53:19
elevate 28:8
elevated 26:20
  35:11 39:19
elevates 46:9
Elevating 26:14
encourage 14:14
ended 5:5 36:4
enforce 23:9
  47:19
enforced 22:9
  23:8 56:25
enforcement
  48:9 51:25
engage 18:3
engaged 15:24
  16:4,13,20
engages 58:14
enlist 17:3

enrichment 6:3,7
  6:10,12
ensues 24:2
ensuring 42:24
entire 34:25
entirely 34:8
  45:8
entitle 36:18
entitled 13:3
  28:8 32:14
  33:17 37:4
  40:11 43:4 45:6
  45:12,16 47:23
  47:24
entitles 34:4
equate 55:6
equipment 50:9
escrow 23:20
ESQ 1:18,20,22
  2:3,6,9,13
essential 55:16
  55:17
establish 18:17
  26:16 59:13
estate 18:15,16
  29:21
ET 1:6
evaporate 38:3
eventually 8:15
everybody 16:12
  43:3 48:13,13
everybody's
  56:7,14
exact 22:2 35:3
  42:24
exactly 12:3 30:2
  38:8,16 40:16
  40:20 46:22
example 3:21
  5:10 10:12
  11:10 12:5
  15:17 19:3
  20:24 22:3 25:6
  27:8 36:8 46:9
  58:19

examples 19:8
  36:6 54:4
exceptions 14:18
  14:20
excessive 39:18
exclude 54:21
  55:9
executive 23:9
  24:20
exercised 11:25
existence 12:23
exists 20:5,22
  30:16
expected 28:13
expecting 28:11
expense 6:9
expertise 43:20
expert's 45:6
explain 50:19
  52:12
explained 47:14
  48:6 51:20
exposed 5:1,7,8
  41:17
exposure 5:3,5
extent 19:3 56:4
extra 39:12
extraordinary
  9:2

**F**

FACA 46:1
facetious 37:21
fact 3:12 4:9,16
  8:6,11,24 17:2
  18:10 19:3,6
  20:4,22 21:5,9
  22:23,25 25:23
  27:25 28:3,7
  30:22 31:3,5,5
  31:8,12,18,21
  31:25 32:1,8,17
  33:8,9,10,13
  34:1,2,8,20
  43:5 44:18,21

45:4,20 47:13
  51:19 52:6,8,12
  53:2,4,11,14
  53:21,24 54:3
  54:13
factual 3:13
  20:22 52:24
fairly 22:5
fall 51:15,17
far 39:11
fault 36:3
FDA 4:17
feature 49:19,20
  49:21,23
Federal 28:18
feel 16:9
feeling 55:17
feels 16:10
fees 15:4,4,5,6,7
  23:20,21
fidelity 41:18
  43:13
fiduciaries 30:7
  30:12
fiduciary 26:14
  27:4,6 30:13
  35:25 36:1,7
  39:22 46:8
figure 27:10
  35:13 50:2
file 41:11
financial 1:3 3:5
  7:16 8:16 30:19
  33:5 41:19 44:7
  47:9,10
financially 30:22
  43:13
find 36:6 54:5
finding 16:3,3
first 1:3,5 3:4,4
  19:3 28:11,14
  32:3,7 46:17
  49:14 57:10
fit 6:2
fixed 7:7,20 15:8

27:15,15,16,17
  28:5 58:14
fixing 58:14
focus 31:2 41:13
  50:20
FOIA 46:1
follow 3:14 46:12
following 23:15
  32:2
forbid 16:19
forbids 16:23
form 35:20 38:21
formulation
  34:24
forth 15:5 32:10
found 34:16,19
four 7:6
framers 50:22
framing 54:5
freedom 26:21
frequently 21:4
full 48:24
full-fledged
  26:14
function 17:5
  44:1
fundamental
  57:25
fungible 14:17
further 24:23
  25:20 42:8 46:6
  46:7,12,16,18
  46:19,20,21,23
  46:23 50:2
  59:16
future 32:23,25

**G**

G 3:1
game 10:4
general 1:23 5:9
  6:25 16:11 24:2
  24:17 28:19
  47:18
generalized

Official - Subject to Final Review

51:24
generally 50:13
generic 24:13
getting 4:3 27:20
  30:25 32:3,5
  34:3,3 42:12
  44:24
Ginsburg 5:20
  5:21 22:10 38:2
  38:5,11,14
Ginsburg's 23:16
give 4:10 12:15
  16:6,11 27:8
  39:6 43:19
  47:17,17
given 17:15
  47:25
gives 10:4 36:17
  45:17
giving 26:21
go 9:13 12:14
  13:20 27:16
  35:15 44:10
  52:4,12,18 54:4
  56:1
goes 22:14 32:7
  41:24 51:19
going 5:17,24
  9:10 14:25
  27:13 30:4
  33:20 39:23,24
  39:25 40:1
  43:17,18,19
  44:13,25 55:7
  56:6
good 9:23 14:18
  34:25 49:22
goods 58:15
gotten 8:12
  10:10 41:16
government 9:12
  19:22 28:18
  46:1 57:14,20
grandmother 4:4
greater 17:11

grievance 36:17
ground 4:18
guaranteed 39:8
guess 19:25
  53:10
guise 51:24

**H**

handling 43:14
happen 14:9 50:5
happened 4:6
happens 46:21
happy 39:11 41:5
hard 32:11 35:3
  35:6,13 36:9
  39:25 43:12
  59:5,6
harm 3:16 4:3,16
  5:2,2 6:1,4 7:3
  8:24 11:16
  12:12 16:19,20
  20:5,22 21:18
  24:2,16,19,23
  24:25 25:5,5,20
  36:1 42:10 46:6
  46:13,13,16,17
  46:18,19,20,21
  46:23,23 51:13
  52:7 53:10
  57:23 58:13,16
  58:19
harmed 9:6 58:5
harmful 5:5,9
harmless 59:12
harms 58:17
harness 50:4,5,6
  50:15,17
hear 3:3
heard 51:9
help 16:7
helped 4:22
high 15:8
hire 16:4,5
historical 50:19
home 39:6 43:7,8

honest 27:20
  28:9,13
Honor 4:8,23
  5:11 6:6 7:14
  8:10,13,20 9:17
  10:16 11:3 12:3
  12:18 13:5 15:9
  18:1 19:1,7
  20:17 22:5,18
  23:25 24:10
  25:2 28:7 33:1
  33:23 34:21
  35:2,8 37:1,15
  37:19,25 38:8
  39:3 40:16 41:9
  42:20 46:19,24
  57:14 59:1
Honor's 8:1
hoping 37:18
house 5:23 16:9
hurts 4:19
hypothetical
  3:21 23:16 29:5
  47:17 50:2
  52:21 55:8,19

**I**

idea 34:23
idiot 28:4,10
III 3:11 12:21
  16:24 18:24
  32:24 47:13
  55:15 59:13
illegal 3:13 5:2
  58:12
illustrates 37:19
illustration 9:23
immediate 52:20
imminent 54:1
impact 22:22
  51:4 54:9 58:10
important 7:18
impose 22:8 27:6
imposed 30:6
impossible 41:18

improperly 15:20
inadequate
  34:13
incentive 14:13
  26:23,24 28:5
  30:9 43:6,11,22
includes 53:23
inconsistent
  20:14 57:9
incorrect 33:23
increase 21:25
incurred 7:15
independent
  29:25 30:5
indicated 15:15
individual 12:12
  17:17 43:12
  47:8 50:13 52:1
  53:17
industry 35:21
information 46:1
informative
  35:15
informed 29:14
injured 13:4
  16:12 30:22
  44:2
injuries 54:6
injury 3:12,14,19
  4:9 7:10,15,17
  8:8,15,16,23
  9:23 10:25 11:2
  12:17,20,25,25
  15:14 16:13
  17:2,2,11 18:8
  18:10,23 19:2,5
  20:4,21 21:6,10
  21:16,16 23:11
  25:23 27:25
  28:3 30:22 31:3
  31:5,5,7,12,18
  31:19,21,22,25
  32:1,8,17,23
  32:25 33:7,9,10
  33:13 34:1,2,20

35:7 36:16
  37:25 38:19,21
  39:13 44:21
  45:2,3,13,13
  45:16,18,20
  47:13 51:19
  52:6,8,9,10,12
  53:4,11,13,14
  53:15,21,24
  54:3,13 55:1
  57:18,20 58:20
  59:6
injury-in-fact
  4:14 37:23
  38:20 41:16
  42:14,19 44:15
  57:23
injustice 6:14
inputs 44:9
inquired 55:21
inquiry 5:4 46:7
insecure 16:10
  55:22
insist 53:3
installed 50:15
instance 28:11
  50:3,11 52:13
  54:8,17
insufficient
  24:15
insurance 5:14
  5:15,25 6:23
  7:7,20 13:7,13
  13:17 14:4,7,14
  14:17 15:1,2,6
  16:4,14,21
  18:14,19 22:14
  23:4,5,21 26:5
  26:6,10 39:6
  40:5 42:10,12
  44:17,20 55:5
insure 43:7
insurer 13:23
  14:12,13 15:22
  26:25

Alderson Reporting Company

Official - Subject to Final Review

| | | | | |
|---|---|---|---|---|
| insuring 43:9 | 28:15,19 43:24 | 37:20 38:2,5,11 | 42:11,25 47:9 | 42:15,20,23 |
| intended 20:25 | 44:3 | 38:14,17,23 | kind 4:19 5:8 6:1 | 44:4,22 45:1,5 |
| 21:3 | issued 6:23 | 39:1,9 40:3,7 | 10:4 11:16 14:3 | 45:14,19 46:14 |
| interest 1:4 | issues 39:23 | 40:14,17,21 | 17:10,23 22:12 | 46:18,22 47:1 |
| 10:22 19:9,10 | issuing 15:22 | 41:2,12,22 42:1 | 30:15 42:18 | large 45:23 |
| 19:10,12,18 | 23:5 | 42:9,16,21 | 50:8 51:12,13 | Laughter 37:17 |
| 20:5 26:15,22 | | 43:23 44:4,14 | 53:12 56:20 | 49:6 56:19 |
| 26:24 27:20,23 | **J** | 44:23 45:3,10 | kinds 21:24 | 57:12,16 |
| 28:8 43:6,9,11 | jargon 49:1 | 45:15 46:11,15 | 22:15 | law 3:17,22,25 |
| 45:9,9,23,25 | JEFFREY 1:20 | 46:20,25 47:6 | knew 44:15 | 15:2 17:22 20:1 |
| 46:2,10 47:15 | 2:6 25:12 | 47:16 48:5,11 | knight 42:18 | 20:6,10,14 21:2 |
| 48:9 50:21 | job 15:19 | 48:16,23 49:1,4 | know 11:13 14:8 | 25:16 26:2 |
| 51:21,25 52:8 | judge 32:2 35:13 | 49:11,16 50:14 | 14:9 15:6,11 | 27:21 28:2,22 |
| 52:14 53:17,25 | 36:23 | 51:8,8 52:2,3,5 | 22:25 23:7 26:7 | 29:6,10 30:18 |
| 55:8,13 | judgment 17:16 | 52:17,20 53:1,9 | 27:24 28:3 | 31:19,22 34:4 |
| interesting 35:15 | 21:24 22:2,25 | 53:19 54:19,25 | 29:13 39:3,11 | 35:10 37:5 |
| interests 20:23 | judgments 28:9 | 55:3,16,18,23 | 42:17,22 43:13 | 39:18,21 44:5 |
| 21:1 44:7 45:24 | judicial 52:24,25 | 56:12,17 57:2,6 | 45:8 50:5 53:5 | 46:9 48:10 |
| interferes 42:6 | Justice 1:23 3:3 | 57:11 58:22 | 56:21 | 49:17 50:22,23 |
| Internal 47:21 | 3:9,20 4:17,24 | 59:17 | knowing 16:9 | 50:24,25 51:16 |
| interpreted | 5:7,17,19,20 | | known 11:25 | 51:25 52:7,9,10 |
| 16:25 | 5:21 7:4,19 8:6 | **K** | 50:22 | 52:15 53:16 |
| interrupt 31:17 | 8:11,17 9:1,10 | KAGAN 10:20 | | 54:15,22 55:10 |
| 58:23 | 9:20 10:1,13,19 | 17:7,21,25 20:7 | **L** | 55:12,12,21 |
| introducing | 10:20,21 11:20 | 21:21 23:13 | label 53:7 | 58:6 |
| 25:18 | 12:4,5,14 13:1 | keep 16:8 56:1,4 | lack 51:14 | lawyers 16:3 |
| invade 29:2 | 13:11,19 14:2,7 | KENNEDY 9:10 | lacking 6:22 | law's 39:19 |
| invaded 19:12 | 14:15 15:10 | 9:20 10:1,13 | laden 32:5 34:6 | leads 14:15 |
| 28:23,24 | 16:2 17:7,21,25 | 14:15 15:10 | Lamken 1:20 2:6 | left 53:2,6 |
| invasion 12:24 | 18:12,22 19:5 | 23:15 24:3,9 | 25:11,12,14 | legal 20:18,24,25 |
| 25:21 29:2 | 19:17 20:7,8 | 29:4,13 45:10 | 26:12,20 27:19 | 21:2 28:10,16 |
| 31:11 45:19 | 21:9,21 22:10 | 45:15 54:19,25 | 28:7,22 29:12 | 35:12 49:1 51:5 |
| 47:14 50:20 | 23:13,15,15 | 55:3,16 | 29:15 30:2,6,18 | 53:7,10,15 |
| 51:5,20 52:14 | 24:3,9,21,22 | key 22:6 | 31:10,15 32:1 | legally 13:8 |
| 52:15 53:16,24 | 25:9,14,25 | kickback 7:23 | 32:13,19 33:1,9 | 35:12 39:20 |
| 54:7,16,17 | 26:17 27:2,24 | 16:7,16,22 | 33:15,22 34:2 | 47:14 50:20 |
| 55:13,21 | 28:15 29:4,5,13 | 25:18 26:3,7 | 34:15,21 35:2,8 | 51:21 52:7,14 |
| invention 6:11 | 29:24 30:3,11 | 42:6 43:5,22 | 35:10 36:11,14 | 53:16,25 54:7 |
| invokes 3:17 | 30:24 31:13,16 | 56:24 | 36:25 37:3,7,10 | legislatively 17:3 |
| involve 10:2 | 32:2,6,18,21 | kickbacks 6:1 | 37:15,18,25 | 18:8 |
| involved 36:7 | 33:7,11,18,24 | 17:12 23:3,18 | 38:3,5,8,13,16 | legislature 55:14 |
| involving 9:19 | 34:12,18,22 | 26:23 28:25 | 38:19,25 39:3 | lesser 17:11 |
| 10:11 20:2,2 | 35:5,9,14,17 | 30:8 33:5 40:9 | 39:14 40:6,10 | let's 10:21,23 |
| 23:3 56:22 | 36:11,13,20 | 43:10 45:8 | 40:16,20,23 | level 35:6 |
| issue 15:13 | 37:2,6,9,12,13 | kickback-free | 41:9,17,25 42:3 | liberty 58:1 |

Alderson Reporting Company

Official - Subject to Final Review

likelihood 24:13
limitation 57:25
line 9:11 44:6
  50:24,24,25
liquidated 37:4,6
little 29:6 36:9
  50:2
loads 36:6
long 32:13 45:20
  52:6
look 44:10
looked 51:11
looking 5:4 27:24
  40:4
loss 3:18 25:21
  29:18 38:22
losses 30:19
lost 10:17 40:17
love 49:5
loved 4:5,5
Lovely 49:4
lower 15:3 23:19
  24:5
loyalty 25:17
  26:1,1,9 27:5
  27:18 35:24
Lujan 20:15 48:7

**M**

M 1:18 2:3,13
  3:7 57:4
machine 49:18
  50:3
Magruder 29:19
maintain 5:16
  12:11
majority 37:7
making 21:7 27:9
mandate 7:7,8
manner 13:16
  22:8
market 9:13 15:8
  16:9 23:19,23
  24:4
marks 58:23

matter 1:14 5:9
  6:25 20:23
  21:17,18,19
  29:6 33:20
  59:21
mattered 13:10
matters 22:1
mean 20:16 25:3
  32:9 36:20
  37:21 41:13
  44:2 51:9
meaning 45:18
means 3:12 4:15
  4:15 53:22
meant 17:19
  51:12,16
measure 54:14
  54:14 59:5,7
mechanic 29:25
mechanism 18:8
member 32:15
  39:13
mere 21:9 22:23
merits 16:5,15
  16:21
Michoud 10:5
middle 35:16,17
midnight 12:6
mind 36:6
minimum 3:12
minutes 57:3
misappropriated
  6:18 11:4
misappropriati...
  3:18
Monday 1:12
  48:21
monetized 56:11
  56:13
money 13:2,6,6
  36:1 38:7 40:8
  40:17,18 43:7
  47:11 56:23
month 4:6
morning 3:4,24

mortgage 11:23

**N**

N 2:1,1 3:1
name 15:25
narrow 48:19
narrowing 14:18
national 47:25
necessarily 7:15
  41:9,15
necessary 49:17
necessity 47:19
need 29:7
needs 48:21 49:8
negotiated 17:13
  18:4
neither 30:12,14
never 14:16
nevertheless
  4:13 44:23
nexus 48:23,24
night 3:23
nominal 8:17
  36:18 37:1,24
  51:5 54:15
  58:24 59:7,9,13
non-financial
  58:17
non-kickback-...
  42:13
non-property
  46:2
norm 9:9
notion 34:8 42:17
November 1:12
no-kickback
  17:9
number 30:18

**O**

O 2:1 3:1
object 54:20
objections 15:16
obtain 30:9 39:7
  45:25 57:24

obtaining 28:9
  42:6
obviously 48:19
  56:10
occur 15:14
occurred 44:19
offered 30:9
Ohio 5:14 13:13
  33:19 41:8,10
okay 3:24 4:6
  13:20 27:14
  31:13 32:6
  33:24 35:9 37:9
  41:12 44:23
  47:24 49:11,24
once 35:22
open 58:8
operation 55:10
opinion 27:20,23
  48:7
opportunity 3:19
  6:20 11:4 19:11
opposed 42:12
  52:9
option 11:7,12
oral 1:14 2:2,5,8
  3:7 25:12 47:3
order 9:4 12:11
  39:7 50:10
ordinary 11:6
outcomes 7:1
outside 51:16
overcharge 8:3
owed 3:15 25:17
  26:1 36:15
  38:10,20 57:17
  58:6
owner 29:10
owning 54:20

**P**

P 1:9 3:1
PAGE 2:2
paid 5:13 7:12,23
  10:17 13:2,5,6

13:7 29:21,22
  40:4,8,15,17
  47:23 48:2
  56:23
paid-for 19:11
paneling 41:21
Panner 1:18 2:3
  2:13 3:6,7,9 4:8
  4:23,25 5:11
  6:6 7:14,25
  8:10,13,20 9:8
  9:17,21 10:2,15
  10:20 11:2 12:2
  12:7,18 13:5,15
  13:21 14:6,11
  15:9,12 16:24
  17:7,13,24 18:1
  18:20,25 19:7
  19:24 20:7,16
  22:4,17 23:25
  24:7,10 25:2,10
  57:3,4,6,13,17
  59:1
paradigm 23:3
Pardon 38:25
pariah 35:19
  36:2,12
part 16:15 41:14
  50:3
parted 40:25
participates
  47:10
particular 12:10
  12:20 13:23
  17:17 23:11,12
  24:11,23,25
  26:22 44:12
  47:10 50:8
  53:17,18
particularized
  12:9 25:23 43:8
  45:22 51:22
  53:20,22 54:2
  57:15
parties 17:14

18:3,6 21:1
partly 16:22
parts 29:8,8,9
  49:18
party 9:13
pass 23:7,8
passes 3:22
  17:22 35:19
pause 31:17
pay 17:19 40:4
  56:8
paying 39:17
  49:10
pays 47:11
peculiar 41:14
pejorative 32:9
people 3:23 4:19
  16:8 22:13 26:4
  29:7 44:1 48:16
  48:20,21 56:2,4
  58:1,16
percent 4:18,22
perfectly 39:11
  41:4
performance
  17:18 46:4 59:3
  59:5
permission 6:19
permits 15:2
permitting 28:21
person 9:14
  18:18 24:3
  29:17 47:24
  48:1 51:12
  56:10 58:6
personal 12:12
persons 49:10
Petitioners 1:7
  1:19 2:4,14 3:8
  57:5
philosophical
  42:22,23
phone 3:23,25
  29:7
phrase 10:5

piece 11:10 56:2
place 27:16 28:6
  28:14 46:17
plaintiff 3:11,15
  4:12,15 5:8 6:3
  6:9,14,18,19
  7:2,11,17,21
  8:3,8,14,22,25
  10:3,5 11:21
  12:13,20 13:6
  13:12,15 14:3
  15:25 16:18
  17:1 18:11 19:9
  21:12 23:12,22
  24:19,22 25:5
  29:20 44:15
  51:17 53:18
  56:7,23 57:14
  57:18,24 58:8
plaintiffs 3:16
  48:20
playing 33:4
plead 31:24
pleading 22:17
please 3:10 7:19
  25:15 47:7
point 12:8 14:10
  14:16 21:7 22:6
  30:25 35:5 36:9
  51:9 56:13
pointed 26:13
policy 8:4,4,12
  13:7,9 14:8,22
  14:22 15:23
  23:5 42:10 55:5
poor 14:14
population 58:13
position 7:5,13
  8:19 12:15 31:1
positions 57:7
possible 22:20
  31:2 32:23,25
  34:23 40:2 42:7
  58:7
potential 5:25

32:14,18,19,24
  34:5 43:2
potentially 17:20
  18:21 34:3
power 12:15
  55:15,15 58:2
practice 6:24
  23:11
practices 21:24
  23:2
prearranged
  11:22
precisely 21:12
  36:12 37:10
  38:9 43:15
preclude 41:10
presume 7:9
presumed 31:6
  35:7
presumes 31:5
presuming 12:17
presumption 8:7
price 7:7 11:24
  14:25 15:5
  21:25 24:6
  34:10 39:18
  41:7,10 42:10
  43:18 44:18
  58:14,14
prices 23:20
price-fixing 25:7
principally 48:7
prior 57:9
privacy 55:18
private 3:11
  28:21
probability 23:18
  23:23 24:5
problem 5:22
  14:9 15:17
  27:11,14
problems 23:14
  27:3
procedures
  13:18

produced 49:18
product 11:22,24
  47:22 49:22
prohibited 23:2
prohibition 23:7
  23:9
promise 17:19
  36:17
proper 26:3
property 3:18
  6:17,20 10:23
  10:24 11:10,17
  14:19 19:10
  45:25 54:20
  55:11,25,25
  56:2,4
proposition
  21:11 32:7
proscribed 49:9
protect 21:1,3
  39:20 40:1 44:6
  46:2 50:10,12
  51:12,16
protected 27:21
  27:22 35:12
  45:24 46:3,5
  47:15 50:21
  51:21 52:7,14
  53:16,25 54:7
protection 28:10
  28:16 35:12
  38:13,21 43:4
  50:7
protects 39:6
  54:22
prove 5:21 6:4
  7:11 8:9 16:10
  21:23 22:1 29:1
  33:14 35:3,6
  36:16 38:12
  39:18 41:23
  43:12
proved 33:15
  41:23
provide 13:14

44:1 50:7,12
provided 13:17
  14:5
provides 26:25
proving 42:8
provision 17:23
  50:12
prudential 51:10
  51:14,18
public 32:16
  45:23 48:9
purchase 29:8,9
  29:23 40:13
  42:25 43:9
  49:20 50:10
purchased 8:3
  14:4 50:4
purchaser 18:14
  18:17,18
purchasers 50:7
purchases 13:12
purchasing 22:14
purely 42:21
purpose 12:10
  44:10,11,12,13
  12:25 17:4
  18:24 49:22
pursue 43:6 45:9
put 14:25 27:25
  36:5

Q

quality 5:15
  14:22 21:19
  26:25 34:9,24
  34:25 39:17
  43:19 44:18
quantification
  54:12
quasi-contract
  6:12
question 7:2 8:1
  8:2,21,22 14:21
  20:18,21 21:5,6

Official - Subject to Final Review

68

21:8 22:19 24:8
24:11 28:1
31:17 37:22
39:15 41:13
45:12 54:11
56:18
questions 20:8,8
59:16
qui 36:8
quite 4:11 33:22
quote 32:22

---
**R**
---

R 3:1
rate 5:13 13:8
15:3
rates 8:2
read 22:5 31:6
real 18:15,15
52:20
realistic 52:25
realize 28:4
really 3:21 10:24
14:5,11,12
24:16 56:17
reason 5:12 18:2
34:17 35:3
39:21 42:3
43:15 55:8,9
reasonable 18:5
23:17,22 24:5
49:9
reasonably
49:14
rebuttal 2:12
25:1 57:4
receive 4:2 40:1
40:15
received 5:16 6:5
6:8 12:6 13:7
13:22 33:2
receiving 6:15
recognition 59:4
recover 9:5
16:12

recoveries 20:2
recovery 4:20
38:15
redress 57:24
58:7
referral 13:23
32:4 34:5 40:12
40:21 43:20
45:7 47:9
referred 15:21
47:12
reflect 6:7,12
21:11 22:24
reflected 20:23
21:4
reflects 10:16
regarded 49:14
regularly 44:5
regulate 39:24
43:17,18,18
regulatory 17:4
reiterating 51:9
related 14:24
relation 30:4
relationship
18:17,21,23
19:16 20:19
27:4,7 28:12
30:15,15
relatively 6:11
relevant 44:16
relief 11:19 44:1
relies 21:12
remainder 25:8
remaining 57:3
repair 29:7
repeatedly 47:14
51:20
repeating 53:11
represent 17:16
represented
14:20
reputation 3:19
58:19
require 19:5 23:7

42:4
required 9:24
10:11 13:8
21:16 31:6,8,21
46:13 57:21,22
57:23
requirement
4:15 53:20
requirements
32:23 47:19
requires 3:11
16:25 45:13
49:18
research 14:23
reserve 24:21
25:8
residual 15:23
respect 6:6 15:18
21:8 53:17
59:14
Respondent 1:21
1:25 2:7,11
25:13 47:5
Respondents
9:12
response 20:7
responsibility
19:13
restitution 6:2
11:11
restraint 9:4
result 8:5 13:22
19:21 20:11,12
28:20 34:10
36:22 58:15
resulting 23:24
results 46:6
Revenue 47:21
rid 14:20
right 6:18 9:3
10:1 11:23,25
12:23,24 16:12
16:17 17:24
20:10,12 21:22
22:12 25:21

26:21 28:22,23
28:24 29:2
30:16 31:11,14
35:1,11 36:9
38:16 39:19
40:1,20 42:24
43:1,19 44:8,10
44:11 45:14,20
45:25 47:8,11
47:25 48:23
49:13 51:5,13
51:24 52:16,19
52:22 54:7,8,21
55:1,4,9,25,25
56:1,4,6,9
rights 18:6 44:6
46:4 50:24
55:11,13
right's 55:2
rise 4:10
risk 14:12 15:23
road 14:10 41:21
ROBERTS 3:3
5:19 25:9 30:24
31:13,16 32:6
32:18,21 33:7
33:11,18,24
34:12,18,22
35:5,9 37:13,20
38:17,23 39:1,9
41:2,12 46:11
46:15,20,25
52:2,5,17,20
53:1,9,19 55:23
56:12,17 57:2
59:17
role 57:25
rule 37:5,7 51:10
rusty 29:6

---
**S**
---

S 2:1 3:1
safety 50:4,5,6,9
50:15,17
sale 26:6

satisfy 32:23
savings 23:24
saying 19:18,25
21:22 52:9,15
53:21
says 3:22 10:6,7
12:5 17:22
21:17 22:12
33:20 36:1,23
38:6 39:5,18
47:22 57:20
Scalia 9:1 10:19
10:21 18:12,22
19:5,17 25:25
26:17 28:15
29:24 30:3,11
41:22 42:1,9,16
42:21 43:23
44:4 47:16 48:5
48:11,16,23
49:1,4,11,16
50:14 51:8 52:3
57:11 58:22
Scalia's 20:8
21:9
se 19:1 21:10
search 15:4
second 15:3
section 58:13
secure 16:8,9
security 55:17
see 9:18 20:1
27:4 28:2 31:3
39:9,10 51:11
seeing 35:16
seek 36:24 43:11
seeking 11:19
38:6,6,9 40:24
57:24 58:7
selecting 18:18
self-dealing 11:9
sell 3:24 55:25
56:10
seller 14:19
18:16 26:10

Alderson Reporting Company

| | | | | |
|---|---|---|---|---|
| 42:11,13 47:25 48:1 | slide 32:10 | standard 29:10 | 32:4 33:2 | 24:14,17 25:5 |
| sells 10:22 11:10 58:14 | sold 4:21 5:24 50:16 | standing 4:10 8:21 13:14 | **SUCCESSOR** 1:4 | **T** |
| sense 32:9 33:1 36:12 53:15 | solely 55:10 | 17:25 31:20 34:14 51:10,15 | sue 4:1,7,24 10:6 13:2 17:12 | T 2:1,1 tainted 56:24 |
| senses 32:2 | Solicitor 1:22 somebody 30:5 | 51:19 52:8 | 25:19 30:16 | take 24:25 27:8 28:12 29:24 |
| separate 54:12 | 30:20 33:4 | 58:18 59:14 | 36:18,20 50:16 | 30:8 47:20 |
| separately 21:6 | 36:15 42:5 | State 7:5,21 15:2 | 54:10 58:16 | taken 6:20 11:18 |
| serve 26:23 | 43:20 56:1 | 28:19,19 55:14 | suffer 5:2 | takes 42:5,5 |
| service 5:15 7:23 | 58:13,20 | statement 56:21 | suffered 16:19 | talk 42:19 |
| 13:22 14:3,5,14 | sorry 5:19 31:16 | States 1:1,15,24 | 17:1 34:10 | talking 9:24 10:4 |
| 17:11 21:25 | 38:18 52:4 | 2:10 7:6,8,20 | 36:16 38:22 | 34:19 35:25 |
| 25:22 27:1 | 58:22 | 47:4 | 58:16 | 55:24 |
| 31:12 47:12,21 | sort 5:4 9:9,21 | status 39:20 | sufficient 12:21 | tam 36:8 |
| 56:23 | 22:22 23:1 | statute 16:17 | 13:13 29:3 | tangible 56:9 |
| services 19:11 | 24:14,15 46:19 | 20:12 28:18 | 32:17 36:18 | tax 48:14,17 |
| 35:11 | sorts 6:10 25:4 | 31:18,24 35:19 | 38:1 48:22 | 51:16 |
| set 15:3 | **SOTOMAYOR** | 38:6,9,15 39:5 | 52:10 57:21 | taxes 47:23 48:2 |
| settlements | 5:17 7:4,19 8:6 | 42:4 51:12 | sufficiently | 49:10 |
| 41:19 | 8:11,17 11:20 | statutes 44:5 | 22:20 25:22 | tax-observant |
| Sherman 9:3,5 | 12:4,14 13:1 | statutory 3:15 | 45:21 51:21 | 47:25 48:1 |
| shop 27:16,17 | 37:12 40:3,7,14 | 4:9,13 8:18 | suggested 17:10 | telephone 4:5 |
| shot 30:17 | 40:17,21 | 12:16,23,24 | suggesting 20:9 | 55:18 |
| show 3:12 7:24 | sought 16:19 | 20:6 21:15 22:7 | suing 47:19 | tell 5:23 7:19 |
| 8:15,23 9:5 | sound 27:10 | 22:24 31:11,13 | suit 59:13 | 27:21,22 29:4 |
| 17:10 22:15 | 31:24 43:13 | 40:8,11 45:20 | suits 20:3 28:17 | 31:23 33:11 |
| 29:18 30:19,21 | sounds 32:24 | 47:8 50:12 58:5 | 28:21 | 41:18 |
| 37:23 58:15 | 34:12,14 | 58:9,9 | support 34:13 | tend 6:25 21:24 |
| showing 25:20 | source 20:10,10 | step 50:23 51:1,1 | supporting 1:24 | 21:25 |
| 30:16 39:13 | 20:11 | stipulated 37:4 | 2:11 47:5 | term 45:18 |
| shown 9:2 33:12 | space 55:9 | straight 33:4 | suppose 16:2 | terms 10:17 |
| side 26:8 33:5 | spare 47:18 | straightforwar... | 17:7,21 22:10 | 16:22 25:20 |
| significant 33:13 | spatial 54:22 | 21:17 | 23:16 26:7 | test 47:14 51:15 |
| 33:13 | speak 25:25 | strange 27:7,10 | 47:16,17,20 | Thank 25:2,9,14 |
| similarly 51:6 | specific 52:3,23 | strong 28:4 | 49:17 | 46:24,25 57:2,6 |
| 54:16 57:20 | 56:21 | structure 35:21 | supposed 4:21 | 59:17 |
| 58:17 | specifically | 41:14 | 24:19 | thanks 27:14 |
| simply 40:4 | 20:15 34:16 | studied 44:17 | Supreme 1:1,15 | theory 24:6 |
| 48:19 50:5,23 | specified 38:15 | subject 58:2,20 | sure 8:1 9:18 | thing 4:6 8:17 |
| 51:1 53:15,22 | speculative | submitted 59:19 | 14:21 21:21 | 34:7 52:23 |
| single 44:19 | 24:15,24 | 59:21 | 26:3 54:19 55:6 | 56:25 |
| situation 19:23 | spending 43:7 | substance 4:18 | 59:14 | things 21:23 |
| 19:25 23:4 | sphere 46:8 | 4:20 5:1,3 | sustained 47:12 | 27:12 44:17 |
| 30:14 44:21 | split 59:10 | 35:20 45:17 | sweep 44:8 | 46:3,5 50:21 |
| | stage 5:22 22:17 | substantively | systemic 23:1 | |

Official - Subject to Final Review

| | | | | |
|---|---|---|---|---|
| think 4:11 5:11 | 24:18 | 29:19 51:6 | 11:11 | 56:2 |
| 8:20 9:22 10:3 | trade 9:4 | 52:23 56:25 | use 3:20 34:13 | wanted 43:23 |
| 11:14 12:7,21 | traditional 6:9 | types 50:9 54:5 | 49:3,21 50:6 | wants 27:7 47:20 |
| 13:25 15:1,13 | traditionally | | | Washington 1:11 |
| 16:3,7,11 18:15 | 56:25 | **U** | **V** | 1:18,20,23 |
| 18:20 19:24 | transaction 5:8 | umbrella 54:3 | v 1:8 3:5 29:19 | wasn't 4:21 24:8 |
| 22:4 25:3,6 | 10:9 11:12,15 | unclear 50:1 | 48:7 | 30:11 34:25 |
| 27:11 28:18 | 16:14,20 25:19 | underlying 19:9 | vague 9:22 42:16 | 36:2 51:11 |
| 31:10 32:13 | 26:16 28:24 | 43:17 44:7,9 | valuable 32:4,20 | way 8:24 10:11 |
| 35:14 36:7,8 | 29:3 39:20 41:1 | undermine 26:23 | 33:2,16 34:6 | 11:18 19:2 |
| 37:16 39:14,14 | 41:3,6,7 42:25 | 26:24 30:9 | value 10:17 | 32:16 33:10 |
| 39:16 48:6 | 44:19 47:9,10 | undermines 43:5 | 17:15 18:5 | 36:6 45:7 |
| 51:18,23 55:20 | 56:22,22 | 43:22 | 32:15,18,19,24 | well-respected |
| thinking 3:22 | transactions | undermining | 33:3 34:5 43:2 | 22:11 |
| thought 10:20 | 28:25 | 43:11 | 59:4 | went 24:22 |
| 14:16,16 20:13 | treble 38:7 | understand 8:1 | various 8:2 | We'll 49:3,7 |
| 31:19 33:18 | trespass 50:21 | 19:17 24:10 | vehicle 29:10 | we're 42:3 44:13 |
| 35:24 36:9 | 51:2 54:16,20 | 31:21 44:24 | 50:8,8 | whatsoever |
| threatened 55:2 | 55:22,23 56:9 | 48:15 53:12,20 | vehicles 50:9 | 14:13 26:15 |
| three 7:6 31:2,7 | trial 33:14 | understanding | version 35:17 | 51:4 54:9 |
| 31:9 32:11 | trouble 30:25 | 21:22 24:2 | versus 14:22 | white 42:18 |
| threshold 48:18 | troubled 58:24 | underwriter 23:5 | victims 49:14 | Whitmore 32:22 |
| throw 50:19 | true 9:8 | underwriting | view 46:22 49:8 | Wildlife 48:8 |
| tied 11:22 | trust 6:17 9:11 | 15:22 | violate 52:10 | 52:13 |
| time 14:4,5 25:1 | 9:19,19,22,24 | undifferentiated | violated 10:8 | willing 17:18 |
| 54:5 | 10:2,8 18:17,21 | 25:24 32:16 | 47:11 | word 34:13 |
| title 5:14,24 7:7 | 18:23 19:6,14 | 48:9 | violation 3:14 | words 4:17 |
| 11:23 13:7,12 | 19:16 21:2 22:2 | undo 11:14 | 4:10,13 5:12 | worked 16:10 |
| 13:16,23 14:4,7 | 22:5 30:15 31:7 | uniform 59:8 | 8:5 12:16,24 | working 14:19 |
| 14:10,12,13,14 | 39:22 40:23 | unique 33:19 | 13:24 15:15 | works 23:16 |
| 14:16 15:4,4,16 | 43:6 46:8 | United 1:1,15,24 | 18:23 19:2,13 | world 46:7 |
| 15:19,21 16:4 | trustee 10:10,22 | 2:10 47:4 | 21:5,9,15 24:1 | worse 3:13 6:15 |
| 16:14,20 18:14 | 11:4,8,9 19:20 | universe 43:3 | 24:18 31:18,24 | 8:25 |
| 18:19 22:14 | 19:21,22 36:7 | unjust 6:2,7,10 | 38:20 52:7 | worth 56:3 |
| 23:4,5,21 26:4 | trustees 10:12 | 6:12 | 53:15 57:17,19 | wouldn't 24:24 |
| 26:6,10 38:9 | 20:2 | unlawful 7:1 9:4 | 57:19 58:5,9 | 36:23 |
| 40:5 42:10,12 | trusts 20:2 | 9:6 35:23 | | write 16:17 |
| 43:8 44:17,20 | try 3:24 11:11 | unlawfully 47:12 | **W** | wrong 11:13 |
| 44:20 55:5 | 20:17 50:2 | 56:24 | want 7:23,25 | 27:12 |
| today 37:8 | trying 43:16 | unrelated 17:4 | 10:9 24:25 | |
| told 11:21 | two 29:8 31:4,9 | untainted 45:7 | 27:22 31:1,17 | **X** |
| top 10:23 | 32:2,11 35:6 | untied 11:24 | 31:23 37:1 38:4 | x 1:2,10 |
| tort 9:9,9 | 53:19 55:6 57:7 | unusual 7:5 | 38:17,23 39:1,4 | |
| Tower 16:1 17:8 | type 3:16 7:14 | 35:23 | 39:12 41:3,4,5 | **Y** |
| traceability | 9:23 21:13 | unwind 10:9 11:7 | 41:5,22 55:3 | Yang 1:22 2:9 |

Alderson Reporting Company

Official - Subject to Final Review

47:2,3,6,16
48:4,6,15,18
48:25 49:3,7,12
50:1,18 51:18
52:11,19,22
53:5,14,23
54:24 55:2,7,20
56:11,16,20
57:2
**years** 25:16 37:5
42:5

---
**$**
---
**$1** 36:25 37:14
38:1
**$1,000** 27:13
**$10,000** 36:22
**$453** 42:11,12
**$455** 40:5,25
**$500** 4:1,14,20
16:12 39:12
41:5 **47:24**
49:20

---
**1**
---
**1** 41:14
**10-708** 1:6 3:4
**10:03** 1:16 3:2
**11:02** 59:20

---
**2**
---
**2** 4:22
**2011** 1:12
**25** 2:7
**28** 1:12
**280** 25:16 42:5

---
**3**
---
**3** 2:4

---
**4**
---
**4** 57:3
**47** 2:10

---
**5**
---
**500** 50:17

**57** 2:14

---
**7**
---
**7:00** 3:23,23

---
**9**
---
**98** 4:18

Alderson Reporting Company

# Exhibit C

Westlaw.

Slip Copy, 2011 WL 293759 (E.D.Ky.)
(Cite as: 2011 WL 293759 (E.D.Ky.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
E.D. Kentucky,
Northern Division,
at Covington.
Joel SCHILLING, et al., Plaintiffs
v.
KENTON COUNTY, KENTUCKY, et al., Defendants.

Civil Action No. 10-143-DLB.
Jan. 27, 2011.

Eric C. Deters, Eric C. Deters & Associates, P.S.C., Independence, KY, for Plaintiffs.

Jason Vincent Reed, Edmondson & Associates, Covington, KY, Robert Franklin Duncan, Jackson Kelly PLLC, Lexington, KY, for Defendants.

### MEMORANDUM OPINION AND ORDER
DAVID L. BUNNING, District Judge.
*1 Plaintiffs Joel Schilling, Charles Schulker, and John Telek commenced this § 1983 action against Kenton County, Kentucky, Kenton County Fiscal Court, Terry Carl, Deputy Baldwin, Southern Health Partners, Inc. (SHP), Dr. Ron Waldridge, Nurse Shawnee as well as various unnamed Defendants, alleging due process and Eighth Amendment violations resulting from Kenton County Detention Center (KCDC)'s "continuing practice" and "policy" of denying inmates adequate medical care while incarcerated. (Doc. # 1, ¶¶ 108-11). Plaintiffs also advance several statutory claims arising under state law and a state law claim for negligence. (Doc. # 1, ¶¶ 112-15). Plaintiffs filed this lawsuit as a purported class action on behalf of themselves and those similarly situated.

The matter is before the Court on Defendants Kenton County, Kentucky, Kenton County Fiscal Court, Terry Carl and Deputy Baldwin's Motion to Dismiss Class Allegations and Claims (Doc. # 8). Defendants moved for dismissal of all class allegations and claims pursuant to Rule 12(b)(6) for failure to state a claim, specifically on the basis that Plaintiffs' proposed putative class is an impermissible "fail-safe" class. The motion having been fully briefed (Docs. # 9, 11), the matter is now ripe for review. For the reasons set forth below, and because Plaintiffs fail to propose a viable putative class that complies with Rule 23, Defendants' motion to dismiss Plaintiffs' class allegations (Doc. # 8) is **GRANTED**.

### I. FACTUAL AND PROCEDURAL BACKGROUND
The following facts, which have been gleaned solely from Plaintiffs' Complaint, are accepted as true for purposes of addressing Defendants' motion to dismiss. *Evans-Marshall v. Bd. of Educ.,* 428 F.3d 223, 228 (6th Cir.2005). This lawsuit was brought by Plaintiffs Joel Schilling, Charles Schulker, and John Telek, all of whom were former inmates at KCDC. Plaintiffs allege they were denied adequate medical care while incarcerated in violation of their Eighth Amendment right to be free from cruel and unusual punishment and in violation of their Fourteenth Amendment right to due process. Plaintiffs assert this denial was part of a systemic prison policy by KCDC and SHP to endorse the deprivation of necessary medical care for inmates. (Doc. # 1, ¶ 43). In filing this lawsuit on behalf of themselves and those similarly situated, Plaintiffs define the proposed putative class the following way:

[A]ll individuals who, while incarcerated at KCDC (both prior to and after an adjudication of guilt), have been denied medical attention for their serious medical needs, and appropriate and necessary medication prescribed by recognized medical authorities, as a result of Defendants' neglect and deliberate indifference. The Class also consists of all individuals who, while incarcerated at KCDC (both prior to and after an adju-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 293759 (E.D.Ky.)
(Cite as: 2011 WL 293759 (E.D.Ky.))

dication of guilt), have been subjected to intentional physical and mental abuse by Defendants in violation of the Eighth Amendment prohibitions on cruel and unusual punishments, and the Fourteenth Amendment's guarantee of due process and liberty.

**\*2** (Doc. # 1, ¶ 5). Joel Schilling, Charles Schulker, and John Telek are the representative plaintiffs named in the Complaint, each of whom spent various weekends incarcerated at KCDC during 2009 and 2010.

*Plaintiff Joel Schilling*
Plaintiff Joel Schilling alleges that in April 2010 he suffered from an untreated enterovirus infection during one of three weekends he served time at KCDC for delinquent child support. (Doc. # 1, ¶ 44). On April 2, 2010, seven days before Schilling was to report for his second weekend of incarceration, he fell and injured himself which required the assistance of his primary care physician the following day. (Doc. # 1, ¶ 45). Schilling self-reported to KCDC on Friday, April 9, 2010, and through Sunday of that weekend he alleges that his complaints of worsening pain were ignored and that KCDC failed to provide him his previously prescribed pain medication in violation of his constitutional rights. (Doc. # 1, ¶¶ 49-52).

A week after Schilling's injury, his primary care doctor prescribed the pain reliever Midrin for his enterovirus infection. (Doc. # 1, ¶ 46). Prior to self-reporting, Schilling called to confirm that he would be allowed his pain medication while incarcerated, to which he received conflicting responses. After his first call, he was told he could bring the Midrin with him to the facility. During a later call that same day, he was told the medication would not be allowed. (Doc. # 1, ¶ 48). Schilling took one last dose of Midrin before self-reporting to KCDC at 6:00 p.m. on April 9, 2010. (Doc. # 1, ¶ 48).

Just hours after reporting, Schilling felt ill and requested to see a nurse from the infirmary after he vomited up his dinner meal. (Doc. # 1, ¶ 49). Al-

legedly unattended to all night, Schilling was called to report to the medical department the next morning. The nurse confirmed Schilling's temperature was over 100 degrees for which he received "generic Tylenol." (Doc. # 1, ¶ 53). Schilling again vomited after lunch on Saturday, April 10, 2010.

Later in the day, Schilling's fiancé brought his Midrin and Symbicort inhaler to KCDC. (Doc. # 1, ¶ 54). At 5:00 p.m. on Saturday he was given his Symbicort inhaler, but the nurses refused to administer his Midrin. (Doc. # 1, ¶ 57). At dinner, Schilling was unable to keep down his meal, and he alleges the medical department again ignored his medical needs and allowed him to spend "another sleepless night" in KCDC. (Doc. # 1, ¶ 59). On Sunday, Schilling was given his inhaler, but was denied his Midrin. He refused to eat both his breakfast and lunch meals given his inability to keep down food during the previous two days. Once discharged, Schilling was "able to receive adequate healthcare outside" KCDC and fully recovered from his enterovirus infection. (Doc. # 1, ¶ 62).

*Plaintiff Charles Schulker*
Plaintiff Charles Schulker served two and a half days at KCDC from February 17, 2010 through February 19, 2010 after his arrest on domestic violence charges. (Doc. # 1, ¶ 65). During his transport to KCDC after his arrest, Schulker attempted to jump out of the moving police vehicle. (Doc. # 1, ¶ 65). Given his history of suicidal ideation, he was brought to St. Elizabeth North's emergency room for treatment. Schulker was later discharged to police custody with assurances to the hospital's medical staff that he would remain on suicide watch while incarcerated. (Doc. # 1, ¶ 66).

**\*3** At the time of his detention, Schulker was a severe diabetic and suffered from a myriad of physical ailments. (Doc. # 1, ¶ 63). He alleges that while incarcerated he was denied his anti-depressive medication, his prescribed number of insulin shots, and developed a staph infection from sitting naked on a concrete floor while on suicide watch. (Doc. # 1, ¶¶ 67-68). Schulker asserts, moreover, that he was

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 293759 (E.D.Ky.)
(Cite as: 2011 WL 293759 (E.D.Ky.))

seen by a medical professional and received his insulin shots only once a day despite his need for three shots daily. (Doc. # 67). He contends his repeated requests for medication and treatment went unanswered in violation of his constitutional rights. (Doc. # 1, ¶ 68).

*Plaintiff John Telek*

Plaintiff John Telek was required to spend his weekends in August 2009 incarcerated at KCDC. (Doc. # 1, ¶ 70). Telek is a type 1 diabetic which, in his case, requires insulin shots before every meal and before going to sleep at night. (Doc. # 1, ¶ 70). Telek alleges that despite need for insulin four times daily, the medical staff at KCDC would monitor inmates sugar levels and administer insulin only twice a day-once in the morning and once in the evening. (Doc. # 1, ¶¶ 73, 77).

Prior to his incarceration, Telek had his physician send his insulin prescription with instructions to the KCDC facility. (Doc. # 1, ¶ 70). Despite these instructions, Telek alleges that he was not properly treated while incarcerated. For instance, he made repeated requests to the medical staff that he receive his insulin shots on a more regular basis; his requests were denied each time. (Doc. # 1, ¶¶ 73, 75, 77, 82-84, 86-90, 92-93, 98, 103, 105). After serving his first two weekends at KCDC, Telek sent an email to Defendant Terry Carl describing the lack of appropriate medical care he was subjected to while incarcerated. (Doc. # 1, ¶ 94). His email requested that Carl direct his medical staff to "follow my doctor's instruction on management of my diabetes during the remaining weekends I have to spend in your facility." (Doc. # 1, ¶ 94).

In the subsequent weekends Telek spent at KCDC he claims that he continued to receive the same deficient care. He was not allowed to check his blood sugar more than twice daily and he continued to receive Lantus insulin rather than his prescribed NovaLog insulin.[FN1] (Doc. # 1, ¶ 96). During Telek's remaining weekends at KCDC, his blood sugar would pendulum swing between soaring and crashing; events Telek believed could have easily led him to a diabetic coma. (Doc. # 1, ¶¶ 94-106).

> FN1. Telek received NovaLog during his last incarceration at the end of August, which is his doctor-prescribed insulin. (Doc. # 1, ¶ 99).

In essence, Plaintiffs believe KCDC has a systematic policy of providing inadequate medical care to inmates in violation of their constitutional rights. (Doc. # 1, ¶ 9). Accordingly, against Defendants, Plaintiffs assert a § 1983 claim for unlawful policy or custom premised on a theory of inadequate medical treatment and failure to properly train deputy jailers to attend to inmates medical needs. (Doc. # 1, ¶¶ 17, 109). Moreover, Plaintiffs claim that Defendants were and continue to be grossly negligent in the level of care KCDC provides its inmates, and in so doing, have violated a variety of state regulations and statutes. (Doc. # 1, ¶¶ 113-15). Plaintiffs claimed constitutional and statutory violations as well as their claim of negligence are alleged as a purported class action. Defendants seek to dismiss Plaintiffs' class allegations as an impermissible failsafe class. For the reasons that follow, and because Defendants' argument is well-taken, all class allegations and claims will be dismissed in their entirety.

## II. ANALYSIS
### A. Standard of Review

*4 A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of Plaintiffs' complaint. Federal Rule of Civil Procedure 8(a) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Erickson v. Pardus,* 551 U.S. 89, 93 (2007) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). In reviewing a Rule 12(b)(6) motion to dismiss, this Court "must construe the complaint in a light most favorable to the plaintiff, and accept all of [his] factual allegations as true. When an allegation is capable of more than one inference,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 293759 (E.D.Ky.)
(Cite as: 2011 WL 293759 (E.D.Ky.))

it must be construed in the plaintiff's favor." *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir.1998) (citations omitted). The Court, however, is not bound to accept as true unwarranted factual inferences, *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir.1987), or legal conclusions unsupported by well-pleaded facts. *Teagardener v. Republic-Franklin Inc. Pension Plan*, 909 F .2d 947, 950 (6th Cir.1990).

To survive a motion to dismiss, the complaint "does not need detailed factual allegations," *Twombly*, 550 U.S. at 555, but it must present "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. To satisfy this standard, the complaint must provide "more than labels and conclusions [or] a formulaic recitation of the elements of a cause of action." *Id* at 555. The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id* Essentially, the pleading standard Rule 8 announces does not require exhaustive factual allegations, "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).

Defendants here filed a motion to dismiss that essentially challenges class certification based solely on the allegations in the complaint. In such a situation, the standard of review is the same as that applied in deciding a motion to dismiss under Rule 12(b)(6). *Jimenez v. Allstate Indem. Co.*, No. 07-cv-14494, 2010 WL 3623176, at *3 (E.D.Mich. Sept. 15, 2010) (court granted defendants' motion to strike class allegations from the plaintiff's complaint applying a Rule 12(b)(6) standard). The moving party has the burden of demonstrating from the face of the plaintiffs' complaint that it will be impossible to certify the class as alleged, regardless of the facts plaintiffs may be able to prove. *Id., see also Bryant v Food Lion, Inc.*, 774 F.Supp. 1484, 1495 (D.S.C.1991). Defendants' motion to dismiss class allegations is therefore akin to a preemptive motion to deny class certification; it is preemptive to the extent that discovery on class certification

has not yet commenced.

Although courts generally defer ruling on class certification until discovery on the certification issue is complete and the plaintiff has moved for class certification, "nothing in Rule 23 prevents a defendant from attempting to preemptively deny certification on the grounds that the prerequisites of Rule 23(a) and (b) can never be satisfied." *Jimenez*, 2010 WL 3623176, at *2; *see Vinole v. Country-wide Home Loans, Inc.*, 571 F.3d 935, 939-40 (9th Cir.2007) ("Nothing in the plain language of Rule 23(c)(1)(A) either vests plaintiffs with the exclusive right to put the class certification issue before the district court or prohibits a defendant from seeking early resolution of the class certification question."). Regardless of who raises the certification issue, the analysis must begin and end with "a rigorous analysis into whether the prerequisites of Rule 23 are met." *American Med. Sys., Inc.*, 75 F.3d 1069, 1078-79 (6th Cir.1996) (quotations omitted); *see Thomas v. Moore USA, Inc.*, 194 F.R.D. 595, 597 (S.D.Ohio 1999)). If Plaintiffs are unable to establish even just one of the prerequisites of subdivisions (a) or (b), the class allegations must be dismissed. *American Med. Sys.*, 75 F.3d at 1079.

**B. Rule 23**

*5 A class action may not be approved simply "by virtue of its designation as such in the pleadings." *Id.* A plaintiff seeking to certify a class must meet all four requirements of Rule 23(a) and one of the requirements of Rule 23(b). Rule 23(a) identifies four threshold requirements for class certification commonly referred to as numerosity, commonality, typicality, and adequacy of representation, which means (1) the class must be so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the named representatives are typical of the claims and defenses of the entire class; and (4) the named representative will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23. An adequate basis for each

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 293759 (E.D.Ky.)
(Cite as: 2011 WL 293759 (E.D.Ky.))

prerequisite must be pled and supported by the facts. *Weathers v. Peters Realty Corp.,* 499 F.2d 1197, 1200 (6th Cir.1974).

Rule 23(b)(1) certification is appropriate if the prosecution of individual actions could result in inconsistent or varying judgments. Rule 23(b)(2) permits certification for injunctive and declaratory relief where "the party opposing the class has acted or refused to act on grounds that apply generally to the class." And, class certification is appropriate under Rule 23(b)(3) if there are questions of law and fact common to the members that predominate over any questions affecting individual members, provided the class action is the most appropriate vehicle for litigating the claims presented. Fed.R.Civ.P. 23; *see Bremiller v. Cleveland Psychiatric Inst.,* 879 F.Supp. 782, 797 (N.D.Ohio 1995).

**i. Class Definition**

Despite the absence of an explicit dictate, Rule 23(a) inherently requires that a class be sufficiently definite "so that it is administratively feasible for the court to determine whether a particular individual is a member." 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1760 (3d. ed.) Accordingly, "[b]efore delving into the 'rigorous analysis' required by Rule 23, a court first should consider whether a precisely defined class exists and whether the named plaintiffs are members of the proposed class." *Chaz Concrete Co., LLC v.Codell,* No. 3:03-52, 2006 WL 2453302 (E.D.Ky. Aug. 23, 2006) (citing *Bentley v. Honeywell Int'l, Inc.,* 223 F.R.D. 471, 477 (S .D.Ohio 2004)).

Although unique to each case, important elements that form the contour of a putative class are: (1) identification of a particular group that was harmed during a particular time frame, in a particular location, in a particular way; and (2) an order defining the class such that its membership can be ascertained in some objective manner. *East Tex. Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 403 (1977) (discussing membership in a proposed class); *Garrish v. United Auto., Aerospace, &*

*Agric. Implement Workers,* 149 F.Supp.2d 326, 331 (E.D.Mich.2001). The class definition should avoid subjective standards such as the plaintiff's state of mind or terms that depend on a merits adjudication. A class definition is therefore too general where it requires the Court to determine whether an individual's constitutional rights have been violated in order to ascertain membership in the class itself. *Catanzano v. Dowling,* 847 F.Supp. 1070, 1078-79 (W.D.N.Y.1994).

*6 Here, Defendants' assert that Plaintiffs' proposed class definition is impermissible in that it creates a fail-safe class. A fail-safe class is "defined by the merits of [the plaintiffs] legal claims, and [is] therefore unascertainable prior to a finding of liability in the plaintiffs' favor." *Velazquez v. HSBC Finance Corp.,* No. 08-4592, 2009 WL 112919, at *4 (N.D.Cal. Jan. 16, 2009). Once it is established that a potential class member will not prevail against the defendant, the member drops from the class. *Kamar v. RadioShack Corp.,* 375 F. App'x 734, 735 (9th Cir.2010). A fail-safe class is inherently deficient in that it "precludes membership unless the liability of the defendant is established." *Id.* at 736. Defining class membership this way is "palpably unfair to the defendant, and is also unmanageable" for obvious reasons; not the least which includes Defendants' inability to provide class notice pursuant to Rule 23(c). *Id.* Plaintiffs argue, however, that the proposed putative class is sufficiently definite, asserting that the definition as proposed does not require resolution of the individual merits of a claim for a determination of class membership. (Doc. # 9 at 7). Moreover, Plaintiffs argue that all Rule 23(a) prerequisites are satisfied and the claims as alleged fall within the ambit of all three Rule 23(b) categories. (Doc. # 9 at 17-20). Contrary to Plaintiffs' assertion, the class definition as proposed fails to comply with Rule 23(a).

In *Turner v. Grant County Detention Center,* No. 05-148-DLB, 2008 WL 821895, at *9 (E.D.Ky. March 26, 2008), this Court denied certification of a civil rights class where the proposed definition re-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 293759 (E.D.Ky.)
(Cite as: 2011 WL 293759 (E.D.Ky.))

quired a merits-based inquiry to determine membership and was too broad to render a sufficiently definite class. Because plaintiffs' proposed definition would have required "an assessment of [an inmate's] circumstances of incarceration," such as whether the detention center should have had a policy in place to protect inmates from the particular harm each suffered, this Court rejected it as unworkable. *Id.*

Similarly, Plaintiffs' proposed class definition is fatally flawed because the Court cannot determine its individual members without reviewing the evidence relative to each KCDC inmates' incarceration, which would amount to a merits-based inquiry of each individual's claim. *Kissling v. Ohio Cas. Ins. Co.,* No. 5:10-22-JMH, 2010 WL 1978862, at *3 (E.D.Ky. May 14, 2010) (court granted defendants' motion to dismiss class allegations where extensive factual inquiry would be required to determine the individual class members ultimately concluding that a "fail-safe class is prohibited."); *Brashear v. Perry Cnty.,* No. 6:06-143-DCR, 2007 WL 1434876, at *2 (E.D.Ky. May 14, 2007) ("Where extensive factual inquiries are required to determine whether individuals are members of a proposed class, class certification is likely improper.").

Plaintiffs in this case define the class as consisting of individuals who while incarcerated were "subjected to intentional physical and mental abuse by Defendants in violation of the Eighth Amendment ... and the Fourteenth Amendment" and were denied "appropriate and necessary" medical care as a "result of Defendants' neglect and deliberate indifference." (Doc. # 1, ¶ 5). This proposed definition improperly requires the Court to make a legal determination that certain inmates at KCDC were deprived of constitutionally adequate medical care or subjected to physical and mental abuse in violation of their constitutional rights, which is impossible to do without reference to the type of deficient care each individual may have received or the type of abuse each individual may have endured. *See Chaffee v. Johnson,* 229 F.Supp. 445, 448

(S.D.Miss.1964) (In denying class certification the court explained "[t]he vague and indefinite description of the purported class depends upon the state of mind of a particular individual, rendering it difficult, if not impossible, to determine whether any given individual is within ... the alleged class.").

*7 Notably, this Court denied class certification in a case virtually indistinguishable from the one here. In *Holt v. Campbell County,* No. 2:09-cv-82-WOB, Judge Bertelsman denied class certification where Plaintiffs' proposed a class of Campbell County Detention Center inmates who were "denied medical attention for their serious medical needs and appropriate and necessary medication prescribed by recognized medical authorities as a result of Defendants' neglect and deliberate indifference." Almost identical in its definition, Judge Bertelsman rejected certification of this class relying on a previous opinion wherein he determined the discrete factual circumstances relevant to each potential member precluded satisfaction of Rule 23's commonality and typicality requirements.

Plaintiffs argue that Judge Bertelsman's analysis in *Holt* was flawed because he framed the case as a mass tort suit rather than a police misconduct class action. (Doc. # 9 at 7). Plaintiffs cite several purportedly analogous cases that certified civil rights class actions; however, the cases cited define class certification on the basis of very *specific* policies. For instance, a district court approved class certification for a group of female pre-arraignment detainees subjected to strip searches and visual body cavity inspections at Suffolk County Jail. *Mack v. Suffolk Cnty,* 191 F.R.D. 16, 23 (D.Mass.2000). Although the defendants in *Mack* argued that typicality and commonality requirements were not satisfied because each class member was arrested at different times and for different reasons, the Court rejected this argument, finding that the detainees' action was premised on a common legal theory: whether the blanket strip search conducted on each woman was unconstitutional.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 293759 (E.D.Ky.)
(Cite as: 2011 WL 293759 (E.D.Ky.))

The case before this court is distinguishable from *Mack* and the other cases cited by Plaintiffs. The *Mack* plaintiffs identified a sufficiently specific and discrete event-a pre-arraignment strip search or visual body cavity inspection-that allowed the Court to determine class membership by reference to objective criteria. The *Mack* definition identified a particular group that was harmed during a particular time frame, in a particular location, in a particular way. By contrast, Plaintiffs proposed definition is impermissibly broad and lacks sufficient reference to objective criteria. The named Plaintiffs in this Complaint all suffered a different harm that resulted from different types of deprivations. For instance, Plaintiff Schilling was given "generic Tylenol " as a substitute for his prescription pain medication, while Plaintiff Telek was subjected to KCDC's twice daily insulin injection policy even though his condition required more frequent attention. Plaintiff Schulker allegedly suffered the effects of unsanitary confinement in contracting a staph infection while on suicide watch.

These named plaintiffs are not part of a sufficiently definite group of inmates harmed in a particular way by a specific policy such as a discrete pre-arraignment strip search. The named Plaintiffs' allegations are so broad and vary in such significant degree that the Court cannot cull from the Complaint a readily identifiable class of plaintiffs. This Court rejects Plaintiffs' argument in full. Whether Plaintiffs seek to certify a mass tort class action or a police misconduct class action, the proposed class definition must be sufficiently definite to ascertain class membership and must not depend on a merits-based adjudication to determine inclusion.

### ii. Rule 23(a) Requirements

*8 The fatal flaw of Plaintiffs' ill-defined class inevitably dooms their ability to satisfy the Rule 23(a) prerequisites, which-out of an abundance of caution-the Court will analyze.

### 1. Numerosity

Fundamentally, the numerosity requirement assesses whether joinder of all alleged class members would be impracticable, and impracticability depends on the facts and circumstances of each case. *Cash v. Swifton Land Corp.*, 434 F.2d 569, 571 (6th Cir.1970). Numerosity cannot therefore be reduced to some strict numerical formula. Rather, the Court must inquire into whether Plaintiffs "have sufficiently demonstrated the existence of the numbers of persons they purport to represent." *Gevedon v. Purdue Pharma*, 212 F.R.D. 333, 337 (E.D.Ky.2002). To do this, the Court should consider "reasonable inferences drawn from the facts before it," *Senter v. General Motors*, 532 F.2d 511, 523 (6th Cir.1976), but it cannot rely on "speculation or conclusory allegations" of the named plaintiffs. *Gevedon*, 212 F.R.D. at 338.

Satisfying the numerosity requirement is impossible as long as the proposed class membership is unascertainable. Because Plaintiffs' proposed definition is wholly dependent on a merits-based resolution of each potential class members' claims, the putative class is a mere apparition until judgment is rendered with respect to each individual claim. This simply runs counter to the purpose of the class action as articulated in Rule 23 given its role as a procedural mechanism intended to foster efficient litigation. Furthermore, it is a violation of Defendants' due process rights to force them to proceed against a class that remains illusory until a final judgment on the merits. *Ball v. Union Carbide Corp.*, 212 F.R.D. 380, 391 (E.D.Tenn.2002), aff'd 376 F.3d 554 (6th Cir.2004). The insufficiency of Plaintiffs' class definition therefore precludes satisfaction of the numerosity requirement.

### 2. Commonality

The commonality requirement is satisfied "as long as the members of the class have allegedly been affected by a *general policy* of the defendant and the general policy is the focus of the litigation." *Rumpke v. Rumpke Container Serv., Inc.*, 205 F.R.D. 204, 208 (S.D.Ohio 2004) (quoting *Sweet v. Gen. Tire & Rubber Co.*, 74 F.R.D. 333, 335 (N.D.Ohio 1976)). While there only need be one common issue of law or fact it must be common to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 293759 (E.D.Ky.)
(Cite as: 2011 WL 293759 (E.D.Ky.))

all class members. *American Med Sys.*, 75 F.3d at 1080. "[T]he mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir.1988). The existence, though, of just any common question is inadequate because "at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality. What is necessary is a common issue of resolution of which will advance the litigation." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir.1998).

*9 The Eighth Amendment prohibits prison officials from "unnecessarily and wantonly inflicting pain" on prisoners by acting with "deliberate indifference" to prisoners' serious medical needs. *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6 th Cir.2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Mere medical malpractice itself does not constitute a violation of the Eighth Amendment, *Estelle*, 429 U.S. at 106, nor do conditions of confinement that create "mere discomfort or inconvenience." *Talal v. White*, 403 F.3d 423, 426 (6th Cir.2005) (quoting *Hunt v. Reynolds*, 974 F.2d 734, 735 (6th Cir.1992)). The Eighth Amendment is violated only when prison officials demonstrate deliberate indifference to inmates' serious medical needs. *Estelle*, 429 U.S. at 104. A claim of mere negligence, moreover, will not rise to the level of stating a claim; the Defendants' conduct "must demonstrate deliberateness tantamount to intent to punish." *Parks v. Madison Cnty Fiscal Court*, 22 F.3d 653, 660 (6th Cir.1994) (citations omitted).

In this action, Plaintiffs have presented a common question of law: whether certain inmates at the Kenton County Detention Center suffered an unconstitutional deprivation of medical care. However, to resolve the legal issue presented the Court must delve into the specific facts of each inmate's incarceration and the medical needs relative

to that inmate. These highly individualized factual inquires will predominate at trial and, thus, override the appropriateness of the class action with respect to the claims alleged in Plaintiffs' Complaint. (Doc. # 1). The different circumstances relative to each inmate, which may dictate different outcomes and different damages, militates against use of the class action to resolve the matters before this Court. "[T]he commonality requirement will not be met ... if each class members' claim would necessitate an individualized determination of liability." 5 James Wm. Moore, Moore's Federal Practice § 23.23[2]. Accordingly, Plaintiffs' have failed to satisfy this Rule 23 prerequisite.

### 3. Typicality

Rule 23(a)(3) requires that the claims of the named plaintiffs be typical of the claims or defenses of the rest of the class. Typicality involves an inquiry into the relationship between the injury to the representative plaintiffs and the conduct affecting the entirety of the class such that the Court "may properly attribute a collective nature to the challenged conduct." *American Med. Sys*, 75 F.3d at 1082 (quoting Herbert B. Newberg & Alba Conte, 1 *Newberg on Class Actions*, § 3-13, at 3-75, 76 (3d ed.1992)). "Thus, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *American Med. Sys.*, 75 F.3d at 1082. Typicality ensures that a class representative will advance the interests of the entire class. In so doing, the typicality prong determines whether-despite the presence of common questions-each class members' claims involves distinctive factual or legal questions such that class certification would be inappropriate.

*10 Here, Plaintiffs attempt to argue that they have been subjected to the same course of conduct claimed to be typical of the class: "the explicit or implicit practice or procedure of KCDC to deny medical attention and prescribed medication to incarcerated individuals." (Doc. # 9 at 16). The only

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 293759 (E.D.Ky.)
(Cite as: 2011 WL 293759 (E.D.Ky.))

specific policy to which Plaintiffs' make reference is KCDC's practice of administering insulin to diabetics twice daily. More generally, Plaintiffs' object to an alleged implicit acquiescence among jailers and the facility's medical staff of denying inmates adequate medical care and access to prescriptions. However, this challenge is entirely too broad to render the named Plaintiffs typical of the class.

For instance, Plaintiff Schulker was allegedly denied his anti-depressant medication while incarcerated for a weekend at KCDC, while both Plaintiffs Schulker and Telek were denied insulin injections with the regularity their doctors prescribe; Plaintiff Schilling was denied his prescription pain medication during his two-day stay, but was given generic Tylenol as a substitute. These facts alone warrant against typicality. The facts relative to each Plaintiff present varying degrees of deprivation, sufficiently distinct that they cannot be said to be typical. To implicate an Eighth Amendment violation, Plaintiffs must establish that Defendants' unnecessarily and wantonly inflicted pain in denying medical treatment *Flanory v. Bonn*, 604 F.3d 249, 253 (6th Cir.2010). A prisoner *must* "allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106.

The injuries among the named plaintiffs are also atypical. Plaintiff Schilling contends he was forced to endure excruciating pain because Defendants' denied him his Midrin prescription. Plaintiff Telek suffered from erratic sugar levels that would dip and spike as a result of irregular insulin injections, exposing him to the risk of a diabetic coma. Although a diabetic as well, Plaintiff Schulker apparently did not suffer from dangerously erratic sugar levels, but rather, contracted a staph infection on account of KCDC's allegedly unsanitary confinement conditions. On their face, it appears that Plaintiffs Schilling and Telek's allegations are more accurately termed "denial of medical care" claims, while Schulker's claim with respect to his staph infection is more properly a "conditions of confine-

ment" claim. *Napier v. Laurel Cnty.*, No. 6:06-368-DCR, 2008 WL 544468, at *11 (E.D.Ky. Feb. 26, 2008) ("typicality is also defeated by the range of alleged injuries and potential damages."). The Sixth Circuit has held that where the plaintiffs' claims depends on each individual's unique interactions with the defendant, the typicality requirement is lacking. *Sprague*, 133 F.3d at 399. That is certainly the case here. Accordingly, the typicality prerequisite under Rule 23 is not satisfied.

**4. Adequate Representation**
*11 Rule 23(a)(4) requires that (1) the class representative have common interests with the unnamed members of the class, and (2) it appear that the representatives will vigorously prosecute the interests of the class through qualified counsel. *Senter*, 532 F .2d at 524-25. This requirement tests "whether there is any antagonism between the interests of the plaintiffs and other members of the class they seek to represent" and the experience of class counsel for the named plaintiffs. *Cross v. Nat'l Trust Life Ins. Co.*, 553 F.2d 1026, 1031 (6th Cir.1977). Whether representation will be adequate is dependent on the Court's determination with respect to typicality "because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members." *American Med. Sys.*, 75 F.3d at 1083. Accordingly, because typicality cannot be established for the putative class, as defined, adequacy of representation in this case is also lacking.

Finally, because Plaintiff fails to meet the threshold requirements of Rule 23(a), analysis of whether this action should proceed as a class action under one of the subsections of Rule 23(b) is superfluous and will not be considered. *See Ball v. Union Carbide Corp.*, 385 F.3d 713, 727 n. 11 (6th Cir.2004); Fed.R.Civ.P. 23(b) (stating that a class action is only maintainable if Rule 23(a) is satisfied).

**III. CONCLUSION**
Plaintiffs' will not be able to establish the prerequisites of Rule 23(a) as the class is currently

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 293759 (E.D.Ky.)
**(Cite as: 2011 WL 293759 (E.D.Ky.))**

defined, thus, dismissal of the class claims alleged
is appropriate. The need for highly individualized
inquiries to determine whether a KCDC inmate is
even a member of the proposed class warrants a
conclusion that the class mechanism is not an ap-
propriate method for resolving the issues in contro-
versy.

For the reasons previously stated, **IT IS
ORDERED** that:

(1) Defendants Kenton County, Kenton County
Fiscal Court, Terry Carl and Deputy Baldwin's Mo-
tion to Dismiss Class Allegations and Claims (Doc.
# 8) is hereby **GRANTED;**

(2) Plaintiffs' class allegations are hereby
**STRICKEN** from the Complaint (Doc. # 1, ¶¶ 5-9).


E.D.Ky.,2011.
Schilling v. Kenton County, Ky.
Slip Copy, 2011 WL 293759 (E.D.Ky.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4861882 (W.D.Ky.), 18 Wage & Hour Cas.2d (BNA) 422
(Cite as: 2011 WL 4861882 (W.D.Ky.))

**H**
Only the Westlaw citation is currently available.

United States District Court, W.D. Kentucky,
at Louisville.
Jana Christine JONES–TURNER, et al., Plaintiffs
v.
YELLOW ENTERPRISE SYSTEMS, LLC d/b/a
Yellow Ambulance Service, et al., Defendants.

Civil Action No. 3:07CV–218–S.
Oct. 13, 2011.

Brent T. Ackerson, Anderson Law Offices,
Lawrence L. Jones, II, Jones Ward PLC, Louisville,
KY, for Plaintiffs.

Edwin S. Hopson, Mitzi Denise Wyrick, Wyatt,
Tarrant & Combs, LLP, Louisville, KY, for Defendants.

***MEMORANDUM OPINION AND ORDER***
CHARLES R. SIMPSON III, District Judge.
*1 This matter is before the court on motion of
the defendants, Yellow Enterprise Systems, LLC d/
b/a Yellow Ambulance Service, *et al.*, for decertification of the conditionally certified class of
"current and former Emergency Medical Technician/Ambulance Drivers (collectively herein
"EMTs") who currently work or previously worked
for the Defendants at any time from March 29,
2004 until the present, and who were not paid for
all time worked and/or were not paid overtime
wages for work in excess of forty (40) hours per
week." (the "FLSA [Fair Labor Standards Act] conditional class"). The court also has before it the motion of the plaintiffs, Jana Christine Jones–Turner,
*et al.,* for class certification with respect to their
state law wage and hour claims, alleging that Yellow Ambulance engaged in an intentional or reckless pattern and practice of violating Kentucky law
with regard to its employees' rights to lunch breaks,
rest breaks and overtime pay. For the following
reasons, the motion to decertify the FLSA conditional class (DN 76) will be granted and the motion
for certification of a state wage and hour class (DN
77) will be denied.

In this action, the plaintiffs allege that Yellow
Ambulance must compensate them for the automatic deduction of thirty minutes' pay which was not
re-credited to them for occasions when they did not
receive a meal break during a shift or when they did
not receive an FLSA-satisfactory meal break. They
also allege that they were frequently denied rest
breaks and were not paid for acting as "preceptors"
at training sessions for new emergency medical
technicians. The standard for conditional certification being much more lenient than certification
later in the litigation, the court granted conditional
certification of the proposed FLSA class. Notice
was sent to over 900 current and former EMTs. 77
chose to join to "opt-in" to the action.

The parties agree that the FLSA does not require that meal and rest breaks be provided.
However, where a meal break is provided but an
employee is not completely relieved of his duties
for an uninterrupted thirty-minute period, the meal
break becomes compensable, as the employee remains essentially on-the-clock for the benefit of the
employer. Since approximately 1999, it has been
Yellow Ambulance's policy to pay its employees
for 8 hours for an 8 1/2 -hour workday, deducting
for a 30-minute unpaid meal break. Due to the
nature of the work, meal breaks are not guaranteed.
In order to ensure that they are paid for all time
worked, employees must submit a "missed lunch
slip" so that the missed meal time is properly compensated.

There is nothing inherently impermissible
about the means by which Yellow Ambulance calculates its employees' pay. Indeed, the plaintiffs
state in their response brief that "the FLSA [portion
of the] case is about whether or not Yellow had a
policy of providing its employees with thirty
minute uninterrupted meal breaks, thus making the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4861882 (W.D.Ky.), 18 Wage & Hour Cas.2d (BNA) 422
(Cite as: 2011 WL 4861882 (W.D.Ky.))

time a bona fide meal break. If the employees were completely relieved of their duties for an uninterrupted thirty-minute period, then Yellow's practice of deducting thirty minutes of pay was lawful. If, however, the employees were "on stand-by" status and thus "engaged to wait" for the next run, then Yellow's automatic deductions are tantamount to theft from its own employees." Response, p. 2. The court in *Saleen v. Waste Management, Inc.,* 649 F.Supp.2d 937, 940 (D.Minn.2009) faced similar facts:

> *2 Plaintiffs do not contend that any of WMI's written policies are, on their face, illegal. To the contrary, plaintiffs concede that WMI may, consistent with the FLSA, presume that employees take a half-hour meal break. Plaintiffs also concede that WMI may ask employees to inform WMI when they work through lunch. Plaintiffs further agree that, as long as WMI reverses the half-hour deduction when it becomes aware that a worker has not taken a meal break, WMI does not act unlawfully. This is exactly what WMI's written policy requires, and, according to WMI, this is exactly what WMI does.

The wrong allegedly inflicted upon the employees in the case at bar does not derive from the automatic deduction of thirty minutes' pay, a condition common to all EMTs. Rather, the alleged injury results from a failure to pay EMTs for compensable meal time (*ie,* a missed or otherwise FLSA-unsatisfactory meal) if and when it occurs.

The EMTs in the case at bar are unlike the plaintiffs in *Crawford v. Lexington–Fayette Urban County Government,* 2008 WL 2885230 (E.D.Ky. July 22, 2008), corrections officers (1) who all allegedly performed tasks, though varied, during their lunch breaks; and (2) who, while on break, remained the only staff who could respond to emergency situations, and were required to so respond. The court in *Crawford* certified the class of plaintiffs, finding that they all shared a common claim that they did not receive a bona fide meal break. *Id* at p. 8.

By contrast, the EMTs at Yellow Ambulance are required to request approval for a lunch break and provide their exact location. Dispatchers approve or disapprove meal breaks depending upon call volume and available units, and breaks are not guaranteed. Breaks are more readily available on some shifts than others. Yellow Ambulance has adduced evidence that (1) whether EMTs, in fact, call in for meal breaks or turn in a "missed lunch slip" has varied from individual to individual; (2) all employees are encouraged to take advantage of slower periods and take a meal break; (3) all employees receive orientation concerning the company's policies and procedures; and (4) some employees have followed the company's procedures and were compensated for missed lunches.

It is unclear from the briefs what results from a dispatcher's approval of a lunch break. Whether a given EMT is completely relieved of his duties, remains in on-call status, or something in between appears to be a function of the availability and proximity of other units and the call volume at any given time. Further, remaining in on-call status does not, in and of itself, mandate a finding that EMTs' meals are compensable. *ie., Brinkman v. Department of Corrections of State of Kansas,* 804 F.Supp. 163 (D.Kan.1992); *Barefield v. Village of Winnetka,* 81 F.3d 704 (7th Cir.1996); *Harris v. City of Boston,* 253 F.Supp.2d 136 (D.Mass.2003).

The plaintiffs also raise concerns about the record-keeping system, and the processing of "re-credits" for missed meal breaks. They contend, for example, that a management official would deny a request for re-credit if she found any period of downtime in a shift, and that even where she determined to re-credit the time, there were occasions when the adjustment was never made. Pl. Resp. Br., pp. 24. Thus, as the plaintiffs' own brief evidences, a multitude of factors are implicated in determining whether EMTs at Yellow Ambulance were properly paid. The analysis is highly individualized in this case.

*3 District courts have granted motions to de-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4861882 (W.D.Ky.), 18 Wage & Hour Cas.2d (BNA) 422
**(Cite as: 2011 WL 4861882 (W.D.Ky.))**

certify a conditionally certified class where there was great variety in the factual allegations among the individual plaintiffs. *Proctor v. Allsups Convenience Stores, Inc.,* 250 F.R.D. 278, 281 (N.D.Tex.2008). As in *Allsups,* there has been no showing of a "single decision, policy, or plan resulting in the alleged failure to properly compensate EMTs at Yellow Ambulance. *See also, Johnson v. TGF Precision Haircutters, Inc.,* 2005 WL 1994286 (S.D.Tex. August 17, 2005) (Plaintiffs' allegations of overarching policy to deny overtime not borne out by manual instructing emp'ees to ensure accurate timesheets). The "similarly situated" factor is evaluated under a heightened evidentiary standard on a motion to decertify the conditional class. *Valcho v. Dallas County Hospital District,* 574 F.Supp.2d 618, 622–23 (N.D.Tex.2008), *citing Morisky v. Pub. Serv. Elec. & Gas Co.,* 111 F.Supp.2d 493, 497–98 (D.N.J.2000); *Lugo v. Farmer's Pride, Inc.,* 2008 WL 638237 at *3 (E.D.Pa. March 7, 2008). As the plaintiffs have not been shown to be similarly situated, the conditionally certified class must now be decertified.

The plaintiffs have moved under Fed.R.Civ.P. 23 for certification of a class consisting of:

> Current and former Emergency Medical Technicians, Ambulance Drivers, Paramedics and Dispatchers who currently work or previously worked for the Defendants at any time from March 29, 2002 until the present, and (a) who were not paid for all time worked and/or were not paid overtime wages for work in excess of forty (4) hours per week as required by Kentucky law; (b) who were not granted meal breaks in accordance with KRS 337.355; (c) who were not granted rest breaks every four hours as mandated by KRS 337.365; and (d) who were subjected to automatic pay deductions for meals without verification of whether or not they received uninterrupted meal breaks as required by Kentucky law.

(The "state wage and hour class"). This proposed class is an improper "fail-safe" class under *Randleman v. Fidelity National Title Insurance Co.,*

646 F.3d 347, 2011 WL 1833198 (6th Cir.2011) [FN1], in that the class definition "shields the putative class members from receiving an adverse judgment. Either the class members win, or by virtue of losing, they are not in the class and, therefore, not bound by the judgment." *Id.* at 4. Thus, in order to ascertain who is a member of the class, the merits of each individual employee's claims would need to be reached, thus defeating the suggestion that class treatment would be appropriate. Further, the class cannot not be certified under Fed.R.Civ.P. 23(b)(2), as money damages are sought which are not incidental to the injunctive relief demanded in this case. *Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. ——, 2011 WL 2437013 (2011). Plaintiffs do not urge otherwise. Rather, they simply argue, without a valid basis, that *Wal–Mart Stores* does not apply herein.

> FN1. In response to the defendants' contention that the proposed class contains only "winning" plaintiffs, the plaintiffs' offer the observation that the court has the power to alter the proposed class designation and could certify a class of all Yellow Ambulance EMTs, ambulance drivers, paramedics and dispatchers employed at any time from March 29, 2002 to the present. First, the plaintiffs have not made an actual request to alter the proposed class sought to be certified. The off-hand remark concerning alteration of the class designation appears at DN 89, p. 3 in response to the defendants' request for leave to file a supplemental brief. Second, this proposed class of all current and former employees is overbroad and lacks any relationship to the claims asserted in this action.

*4 Therefore, motions having been made and for the reasons set forth herein and the court being otherwise sufficiently advised, IT **IS HEREBY ORDERED AND ADJUDGED** that

(1) The motion of the defendants, Yellow Enterprise Systems, LLC d/b/a Yellow Ambulance

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4861882 (W.D.Ky.), 18 Wage & Hour Cas.2d (BNA) 422
**(Cite as: 2011 WL 4861882 (W.D.Ky.))**

Service, *et al.,* for decertification of the conditionally certified class (DN 76) is **GRANTED** and the opt-in plaintiffs are **DISMISSED WITHOUT PREJUDICE.**

(2) The motion of the plaintiffs, Jana Christine Jones–Turner, *et al.,* for Rule 23 class certification of state law claims (DN 77) is **DENIED.**

**IT IS SO ORDERED.**

W.D.Ky.,2011.
Jones-Turner v. Yellow Enterprise Systems, LLC
Slip Copy, 2011 WL 4861882 (W.D.Ky.), 18 Wage & Hour Cas.2d (BNA) 422

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.